[Crim. No. 19592. Nov. 8, 1977.]

THE PEOPLE, Plaintiff and Respondent, v.
HENRY HONEYCUTT, Defendant and Appellant.

**COUNSEL**

Douglas Shepersky, under appointment by the Supreme Court, Appellate Defenders, Inc., under appointment by the Court of Appeal, and Paul Bell for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, Karl J. Phaler and Cecilia H. Johnson, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**WRIGHT, J.**\*—Henry Honeycutt appeals from a judgment upon a jury conviction of first degree murder. (Pen. Code, §§ 187, 189.) He contends that the foreman of the jury was guilty of prejudicial misconduct which requires that we reverse the judgment. We agree. Although we need not reach defendant's further contention that it was error not to suppress an extrajudicial confession; we nevertheless conclude for guidance of the trial court on retrial, if any, that such confession was extracted without compliance with the proscriptions of *Miranda* v. *Arizona* (1965) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].

Defendant spent the night of March 3, 1975, at William Batiste's home. He discovered in the morning that $72 of his money was missing. When Batiste failed to respond to inquiries concerning the money, defendant kicked and beat Batiste who offered no resistance. In an attack lasting 45 minutes defendant stabbed and slashed his victim more than 100 times with a large two-pronged barbeque fork. A woman, who had also spent the night at Batiste's home, implored defendant to stop the beating. When her requests went unheeded she left the premises and notified the police. When police arrived defendant fled but was apprehended four blocks away. Batiste died that afternoon. The coroner found Batiste's body to have not less than 143 lacerations and puncture wounds covering his head, back, chest, abdomen, groin, penis and hip.

Defendant, an alcoholic for many years, had been drinking heavily for a four-week period prior to the killing. Expert witnesses testified, not without dispute, that based on the elapsed time and blood alcohol determinations made after defendant's arrest, that his approximate blood alcohol level was .24 percent at the time of the offense, sufficient to impair his ability to meaningfully reflect upon the gravity of any contemplated act or to understand the societal duty not to commit acts which involved the risk of great injury or death.

The jury began its deliberations on a Thursday. On Friday morning it requested and received reinstruction on, inter alia, involuntary manslaughter and diminished capacity. Deliberations continued through the afternoon when a weekend recess was taken. While the jury foreman was still at home on Monday morning he telephoned an attorney who was associated with the foreman's business. The foreman advised the

---

\*Retired Chief Justice of California sitting under assignment by the Acting Chairperson of the Judicial Council.

attorney that he was a member of a jury panel but he did not state that he was then involved in deliberations. The foreman asked if involuntary manslaughter was a felony or a misdemeanor. The attorney answered that his criminal practice had generally been limited to defending against charges of felony drunk driving, and that such an offense would be treated as a felony until sentencing when it could be reduced to a misdemeanor. When asked to explain diminished capacity, the attorney stated that it was a defense based on a defendant's state of mind which, if established, would negate the existence of a specific criminal intent in cases wherein such an intent was an element of the crime and legal insanity could not be established. To illustrate his explanation he described how he had obtained a reduction of charges in the case of a client who, in cashing bad checks, actually intended to repay the victims. The attorney emphasized that he had not practiced criminal law for about five years and that his knowledge of the applicable rules might not be current. He advised that in any event the foreman should follow the judge's instructions on the applicable law.[1]

After his conversation with the attorney the foreman reported to court for further deliberations. He later stated that he did not mention the conversation to the other jurors. On Monday afternoon the jury was reinstructed on first degree murder, diminished capacity and malice aforethought. The following morning the jury found defendant guilty of first degree murder.[2]

---

[1] The attorney's declaration states as follows: "I . . . hereby declare: That I am an attorney licensed to practice law in the State of California . . . .

"I am acquainted with [the foreman], a scientist working for our company. On the morning of Monday, June 16, 1975, I received a telephone call from [the foreman], who asked some questions concerning criminal law. He first asked what I knew of criminal law and the sentence for involuntary manslaughter. I told him that I had practiced criminal law several years ago. I explained that involuntary manslaughter, to my recollection, was either a felony or a misdemeanor, depending upon the sentence imposed.

"[The foreman] then asked about diminished capacity. I stated that this defense applied in cases where legal insanity could not be proven, and was used to overcome a requirement of a specific mental state. I mentioned that I had used the defense once in a 'bad check' case, but I had never argued this defense to a jury; and I told him I did not know the current state of the law.

"[The foreman] asked if I knew why he was asking the questions and when I said I did not, I believe he said he was being selected for jury duty. I told him that the judge would instruct him on all of the law to be applied, and my recollections of the criminal law may or may not be valid."

[2] The record discloses that the jurors were admonished on numerous occasions that except during deliberations with other jurors they were to refrain from discussing among themselves or with anyone else the evidence received during the trial.

When the attorney learned three days after their conversation that at the time thereof the foreman had actually been engaged in deliberations, he notified the court. Defendant moved for a new trial (Pen. Code, § 1181, subd. 3), and the attorney and the foreman testified at the hearing thereon. The court denied the motion concluding that although the foreman was guilty of misconduct, defendant had not been prejudiced thereby.

■ It is well settled that a presumption of prejudice arises from any juror misconduct. In an early case we said: "For, when misconduct of jurors is shown, it is presumed to be injurious to defendant, unless the contrary appears." (*People* v. *Conkling* (1896) 111 Cal. 616, 628 [44 P. 314].) We have often restated the presumption. (See, e.g., *People* v. *Wong Loung* (1911) 159 Cal. 520, 528-529 [114 P. 829].) In *Remmer* v. *United States* (1954) 347 U.S. 227, 229 [98 L.Ed. 654, 656, 74 S.Ct. 450], the United States Supreme Court stated: "In a criminal case, any private communication, contact or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial . . . ." However, the presumption may be rebutted by proof that no prejudice actually resulted. (*In re Winchester* (1960) 53 Cal.2d 528, 535 [2 Cal.Rptr. 296, 348 P.2d 904].)

Juror misconduct has occurred in several forms requiring reversal when prejudice is presumed in the absence of evidence to rebut the presumption. The mere presence of an alternate although silent juror during deliberations has repeatedly been held to constitute prejudicial misconduct. (*People* v. *Britton* (1935) 4 Cal.2d 622 [52 P.2d 217, 102 A.L.R. 1065]; *People* v. *Bruneman* (1935) 4 Cal.App.2d 75 [40 P.2d 891]; *People* v. *Adame* (1973) 36 Cal.App.3d 402 [111 Cal.Rptr. 462]; cf. *People* v. *French* (1939) 12 Cal.2d 720, 770-771 [87 P.2d 1014] (presence of alternate jurors after submission but before commencement of deliberations held not to justify granting of a new trial).) The reading by jurors of newspaper accounts of trial proceedings and unauthorized communications between jurors and bailiffs or other court officers has also been condemned as prejudicial misconduct. (*People* v. *Wong Loung, supra,* 159 Cal. 520, 525-527.)[3]

---

[3]Although research has disclosed no criminal case wherein a juror discussed during deliberations questions of law with an outside attorney, in several civil cases courts have resolved similar questions by applying a rebuttable presumption of prejudice. (*Dimmick* v. *Alvarez* (1961) 196 Cal.App.2d 211, 216-217 [16 Cal.Rptr. 308] (brief conversation between juror and party's attorney held harmless); *Maaskant* v. *Matsui* (1942) 50 Cal.App.2d 819, 826 [123 P.2d 853] (juror's discussion with a party's attorney about a

■    When, as occurred in the instant case, a juror contacts an outside attorney for advice during deliberations in a criminal case, he is guilty of egregious misconduct. Such conduct in clear violation of the trial court's admonitions interjects outside views into the jury room and creates a high potential for prejudice. In *People* v. *Conkling, supra,* 111 Cal. 616, 628, we stated that jurors cannot investigate the case outside the courtroom and that they must decide the guilt or innocence of a defendant based only on evidence introduced at trial. It is equally manifest that we cannot condone a practice whereby a juror receives outside counseling relative to the applicable law, as to do so would subordinate the court's evaluation of the law to that of the juror's outside source and would be contrary to legislative directives that the court shall instruct on the applicable law (Pen. Code, § 1127) and maintain control of the proceedings (Pen. Code, § 1044). We cannot, therefore, disapprove too strongly the foreman's decision to disregard the court's instructions and to solicit outside legal advice.

■    We next proceed to the question of prejudice flowing from this serious misconduct. The attorney advised the foreman, inter alia, that in his experience, which mainly concerned vehicular manslaughter, involuntary manslaughter is an alternative felony-misdemeanor depending on the sentence imposed. Although the attorney's advice was accurate concerning vehicular manslaughter (Pen. Code, §§ 192, subd. 3, 193) it was inaccurate with respect to the particular charge of involuntary manslaughter (Pen. Code, §§ 192, subd. 2, 193), which can never become a misdemeanor upon sentencing. Such advice could have left the foreman with the impression that if defendant were convicted of manslaughter he might thereafter be sentenced only to county jail rather than to state prison.  ■ ■■ ■  The foreman's questions to the attorney can be interpreted to imply that he was contemplating a conviction of involuntary manslaughter because of defendant's diminished capacity due to intoxication, but that he was concerned, in view of the gravity of defendant's conduct, that if he were convicted of such lesser manslaughter charge he might escape state prison.[4]

---

map introduced in evidence held harmless).) In personal injury cases jurors have consulted family physicians relative to a medical question which was a principal issue. (Cf. *Walter* v. *Ayvazian* (1933) 134 Cal.App. 360, 363-364 [25 P.2d 526] (misconduct prejudicial because juror reported her physician's advice to the other members of the jury) with *Kritzer* v. *Citron* (1950) 101 Cal.App.2d 33, 36-37 [224 P.2d 808] (misconduct nonprejudicial because no report made to other jurors).)

[4]A defendant's possible punishment is not, of course, a proper matter for juror consideration, and the jury was so instructed in the instant case.

The People point out, however, that the information provided by the attorney was essentially accurate and that all but two of the jurors executed statements that the foreman never mentioned his conversation with the outside attorney. Nevertheless the errant juror was the foreman whose perceptions and conclusions may often sway other jurors. With a belief that manslaughter can sometimes be a misdemeanor the foreman may have elected in favor of a murder conviction notwithstanding considerable evidence supporting the defense of diminished capacity. If so, and particularly if his conclusion influenced other jurors, defendant may have been deprived of the benefit of the jury's full consideration of his diminished capacity defense. (Accord, *Horn* v. *State* (1953) 216 Miss. 439 [62 So.2d 560].)

Under these circumstances the presumption of prejudice was not rebutted but rather was reinforced by the evidence.

█ Defendant also complains that the court erred in failing to suppress an extrajudicial confession. It appears that following his arrest near the victim's residence defendant was placed in the back seat of a patrol car. He was not advised of his *Miranda* rights. (See *Miranda* v. *Arizona, supra,* 384 U.S. 436.) Detective Williams tried to talk to defendant who looked back silently at the officer. During the short ride to the police station, however, defendant volunteered that Williams knew him under a different name. At that point Williams recognized defendant whom he had known through police contacts for about 10 years. They did not converse again while en route to the police station.

Upon arrival at the station detectives escorted defendant to an interview room. Defendant was initially hostile to Detective Tague, calling him racist epithets and spitting at him. Tague left the room and Williams engaged defendant in a half-hour unrecorded discussion. Williams testified that they discussed unrelated past events and former acquaintances and, finally, the victim. Williams mentioned that the victim had been a suspect in a homicide case and was thought to have homosexual tendencies. Although he stated that he did not expect defendant to talk about the offense, Williams testified that "It was my duty to continue the efforts to try to get him to talk. And I was successful in it." In the course of their interview Williams "could see that [defendant] was softening up." Williams said that they stayed away from a discussion of the offense, but by the end of the half-hour defendant indicated that he would talk about the homicide.

Defendant was first advised of his *Miranda* rights in the presence of a reporter three hours after his arrest. When asked whether he understood his rights defendant replied, "I heard what you said, Mr. Johnnie, but I have no rights." Williams asked again if defendant understood his rights and defendant said, "Yes, I understand all my rights." He then expressly waived his rights and confessed that he beat and stabbed the victim to force him to return the missing $72.

Defendant contends that the waiver of his rights was neither knowing nor voluntary.  ■  In the normal case, failure to warn a suspect of his rights results in the total exclusion of any statements he might make. (*People* v. *Disbrow* (1976) 16 Cal.3d 101, 106 [127 Cal.Rptr. 360, 545 P.2d 272].) If a suspect is advised of his rights and invokes them, all interrogation must cease and any subsequent statements must be suppressed. (*People* v. *Superior Court (Zolnay)* (1976) 15 Cal.3d 729, 736-737 [125 Cal.Rptr. 798, 542 P.2d 1390].)  ■  In the instant case, however, no incriminating extrajudicial statements were made by defendant until after the *Miranda* admonitions and defendant's waiver of those rights. However, Detective Williams had, prior to explaining the *Miranda* rights, already succeeded in persuading defendant to waive such rights. Thus the critical question is what effect failure to give a timely *Miranda* warning has on the voluntariness of a decision to waive which is induced prior to the *Miranda* admonitions.

■  It is clear that routine booking questions and responses as to a defendant's identity and other statistical information do not render involuntary a later waiver of constitutional rights. (See *People* v. *Hernandez* (1968) 263 Cal.App.2d 242, 253-254 [69 Cal.Rptr. 448].) Similarly, when a person who is not yet a suspect talks to the police without being admonished, such a conversation does not make involuntary his later waiver of rights after a proper *Miranda* warning. (*People* v. *Hill* (1969) 70 Cal.2d 678, 693-694 [76 Cal.Rptr. 225].) In *Hill,* we stated, "The initial statements made by defendant prior to receiving the required warnings of his constitutional rights were not in response to in-custody interrogation designed to elicit incriminating information." (*Id.,* at p. 694.)  ■  The instant case differs from *Hill,* however, in that here defendant was at all times the primary suspect and the conversation-warning-interrogation sequence was intended to elicit a confession from the inception of the conversation.

In *Miranda* the Supreme Court stated: "Whatever the testimony of the authorities as to waiver of rights by an accused, the fact of lengthy

interrogation or incommunicado incarceration before a statement is made is strong evidence that the accused did not validly waive his rights. In these circumstances the fact that the individual eventually made a statement is consistent with the conclusion that the compelling influence of the interrogation finally forced him to do so. It is inconsistent with any notion of a voluntary relinquishment of the privilege. Moreover, any evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege. The requirement of warnings and waiver of rights is a fundamental with respect to the Fifth Amendment privilege and not simply a preliminary ritual to existing methods of interrogation." (*Miranda* v. *Arizona, supra,* 384 U.S. 436, 476 [16 L.Ed.2d 694, 724-725].)[5]

Although the *Miranda* court nowhere expressly disapproved the conversation-warning-interrogation sequence that occurred here and the rule as generally stated is that the warning must precede any custodial interrogation designed to elicit incriminating statements (see *People* v. *Dorado* (1965) 62 Cal.2d 338, 353 [42 Cal.Rptr. 169, 398 P.2d 361]), we nevertheless conclude that in making his decision to waive a suspect should have that knowledge of his rights afforded him by *Miranda.* The self-incrimination sought by the police is more likely to occur if they first exact from an accused a decision to waive and then offer the accused an opportunity to rescind that decision after a *Miranda* warning, than if they afford an opportunity to make the decision in the first instance with full knowledge of the *Miranda* rights. (See *People* v. *Enriquez* (1977) 19 Cal.3d 221 [137 Cal.Rptr. 171, 561 P.2d 261]. ▮ The police by applying practices condemned in *Miranda* cannot be heard to contend that they should benefit because they have violated only the spirit of *Miranda.* It must be remembered that the purpose of *Miranda* is to preclude police interrogation unless and until a suspect has voluntarily waived his rights or has his attorney present. When the waiver results from a clever softening-up of a defendant through disparagement of the victim and ingratiating conversation, the subsequent decision to waive without a *Miranda* warning must be deemed to be involuntary for the same reason that an incriminating statement made under police interro-

---

[5] In reviewing police practices which made *Miranda* necessary the high court discussed two interrogation ploys. The first was the Mutt and Jeff routine where one officer acts aggressively and hostile while a second officer, when alone with the suspect, seeks to gain his confidence by disapproving his partner's behavior. (*Miranda* v. *Arizona, supra,* 384 U.S. 436, 452 [16 L.Ed.2d 694, 710-711].) The second was disparagement of the victim to induce in the defendant a feeling that his acts were justified. (*Id.,* at p. 450 [16 L.Ed.2d at pp. 709-710].) Both of such ploys were utilized to elicit defendant's waiver in the instant case.

gation without a *Miranda* warning is deemed to be involuntary. The court thus erred in refusing to suppress defendant's extrajudicial statements. As the judgment must be reversed because of the jury foreman's misconduct we need not consider the prejudicial effect of the court's failure to suppress such statements.

The judgment is reversed.

Tobriner, Acting C. J., Mosk, J., and Sullivan, J.,* concurred.

**RICHARDSON, J.**—I concur in the majority opinion to the extent that it reverses the judgment based on juror misconduct, although, as discussed below, I believe that the majority has unduly emphasized the errant juror's status as foreman. I respectfully dissent, however, from the majority's application of *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], to the facts before us for in my opinion defendant's confession was not elicited in violation of the *Miranda* rule.

### 1. *Juror Misconduct*

The majority stresses the special position of the foreman permitting him to influence other jurors, thus imparting to them any prejudice derived from his conversation with the attorney. Such speculation is unnecessary to the result. Because this is a criminal case, if a single juror, whether foreman or not, was prejudiced the entire verdict was infected. Accordingly, our principal inquiry, it seems to me, must ascertain whether there is any evidence in the record from which the trial court properly could have concluded that the presumption of prejudice had been rebutted. No such evidence appears.

In *People* v. *Stokes* (1894) 103 Cal. 193 [37 P. 207], we held that where juror misconduct raised the presumption that the verdict had been prejudiced, jurors could not overcome this presumption by swearing that the misconduct did not influence their verdict. Citing *Stokes* with approval in *People* v. *Hutchinson* (1969) 71 Cal.2d 342 [78 Cal.Rptr. 196, 455 P.2d 132], we held that Evidence Code section 1150, governing the admission of evidence concerning the validity of a verdict, limits jurors' affidavits to "proof of overt acts, objectively ascertainable . . . ." (*Id.*, at

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.

p. 349.) In the present case the presumption of prejudice was not properly rebutted by the foreman's testimony that the conversation with the attorney did not influence his verdict, nor by the attorney's declaration alleging the gist of his conversation with the foreman. Thus, I fully concur with the majority's conclusion that defendant was prejudiced by the error and that the judgment must be reversed on this ground.

## 2. Admissibility of Defendant's Confession

In holding defendant's confession inadmissible, the majority opinion focuses on the following critical passage in *Miranda* v. *Arizona, supra,* 384 U.S. 436: "Whatever the testimony of the authorities as to waiver of rights by an accused, the fact of *lengthy* interrogation or incommunicado incarceration before a statement is made is *strong evidence* that the accused did not validly waive his rights. In these circumstances the fact that the individual eventually made a statement is consistent with the conclusion that the compelling influence of the interrogation finally forced him to do so. It is inconsistent with any notion of a voluntary relinquishment of the privilege. Moreover, any evidence that the accused was *threatened, tricked, or cajoled* into a waiver will, of course, show that the defendant did not voluntarily waive his privilege. The requirement of warnings and waiver of rights is a fundamental with respect to the Fifth Amendment privilege and not simply a preliminary ritual to existing methods of interrogation." (*Id.,* at p. 476 [16 L.Ed.2d at pp. 724-725], italics added.) The majority then reasons that although *Miranda* does not expressly disapprove the conversation-warning-interrogation sequence involved herein, nevertheless "When the waiver results from *a clever softening-up* of a defendant through disparagement of the victim and *ingratiating conversation,* the subsequent decision to waive without a *Miranda* warning must be deemed to be involuntary for the same reason that an incriminating statement made under police interrogation without a *Miranda* warning is deemed to be involuntary." (*Ante,* pp. 160-161, italics added.)

I respectfully suggest that such a conclusion is neither mandated by *Miranda* nor required by notions of justice or fair play. Moreover, the opinion in this regard mischaracterizes the facts in the present case. The record clearly establishes that the waiver and confession in question were made *after* defendant was given the warnings required by *Miranda.* I find no basis for the majority's conclusion, which is squarely contrary to that of the trial court, that any "softening-up" or "ingratiating conversation" rendered involuntary defendant's willingness to confess.

Defendant was arrested and brought to a police station. Upon arrival he was taken to an interview room where he remained with Detectives Williams and Tague for approximately one-half hour. According to Williams, defendant initially cursed the officers and Williams made attempts to calm him and to communicate with him. Eventually, defendant conversed with the officers, although the circumstances of the offense were not discussed. Among other things, the officers and defendant talked about the victim, and the fact that the victim was a suspect in another homicide case, and was reportedly a homosexual. Contrary to the majority's suggestion, other than the officers' attempts to calm down defendant after his initial outburst of profanity, the record contains no evidence whatever of any "ingratiating" conversation or "clever softening-up" of defendant by the officers.

Once defendant indicated that he would talk about the homicide a stenographer was called in and defendant was fully advised of his *Miranda* rights. Defendant was asked twice if he understood his rights and then, after expressly waiving his rights, he confessed that he had beaten and stabbed the victim.

Addressing the issue of voluntary waiver, the *Miranda* court observed that, "No effective waiver . . . can be recognized unless specifically made after the warnings we here delineate have been given." (*Miranda, supra,* at p. 470 [16 L.Ed.2d at p. 721].) The record before us reflects that the defendant ultimately *was* given the requisite *Miranda* warnings, stated that he understood his constitutional rights, waived those rights, and *then* made his incriminating statement. Notwithstanding this fact, the majority holds as a rule of law that such a waiver is inevitably invalid merely because the warnings are not given *immediately* upon a suspect's arrest. Furthermore, the majority opinion inadequately explains with sufficient certainty precisely what type of police-suspect contact or conversation renders a waiver invalid. The terms "clever softening-up" and "ingratiating conversation" sound suspiciously vague as standards, particularly in the police investigation area which requires application of practical, readily understood rules of considerable specificity. Depending upon the interpretation given the foregoing phrases they may well prove unduly restrictive.

In summary, the majority not only adopts what seems to me to be an overly literal reading and interpretation of *Miranda,* but appears to extend that interpretation to create an irrebuttable presumption to the effect that, unless a *Miranda* warning is issued before *any* conversation

with a suspect occurs, a subsequent waiver is ineffective. It would seem to me much more reasonable to leave to the discretion of the trial court the task of determining if, in the light of all the circumstances in the case, the suspect has been fully informed of his rights and has freely, knowingly and voluntarily waived those rights. Here the trial court made such a determination, and I find no evidence of threat, trickery or cajolery which would invalidate the waiver.

Accordingly, I dissent from that portion of the majority opinion and would hold that defendant's confession was properly admissible at trial.

Clark, J., and Thompson (R. S.), J.,* concurred.

Respondent's petition for a rehearing was denied December 8, 1977. Clark, J., and Richardson, J., were of the opinion that the petition should be granted.

*Assigned by the Chairperson of the Judicial Council.