The State of Ohio, Appellee, *v.* King, Appellant.

(No. C-820648—Decided June 22, 1983.)

Mr. *Simon L. Leis, Jr.,* prosecuting attorney, and Mr. *William E. Breyer,* for appellee.

Mr. *H. Fred Hoefle,* for appellant.

BLACK, P.J. Defendant-appellant, Charles Browne King ("defendant"), was convicted in a jury trial of purposely causing the death of Delonise Stamps while committing robbery, an aggravated murder in violation of R.C. 2903.01(B). His four assignments of error raise three claims: that his motion for a mistrial on grounds of juror misconduct was erroneously overruled; that his confession was submitted in evidence before the *corpus delicti* had been established; and that the judgment is not supported by sufficient evidence.[1] We are not persuaded that any of the claims has merit.

At the initiative of a neighbor, police forcibly entered the apartment of Mrs. Delonise Stamps, who was seventy-seven years old, because nothing had been heard from her for an unusual length of time. Her body was found on the floor, partially clothed and partially on its back. Police assumed that she died of natural causes, covered the body and had it removed to the morgue. As the chief deputy coroner was about to begin a post-mortem examination the next day, he discovered that Stamps' hands were tied behind her back and that her face, arms and torso were bruised. A homicide investigation was immediately begun.

Police learned that defendant had been seen carrying a bag of groceries for Stamps as she entered her apartment, by a witness who knew both of them, and that later, another witness had seen a man wearing the same sort of dark clothing worn by defendant leave the Stamps apartment, although this second witness could not identify this man as the defendant. When the police found defendant, he was brought to homicide headquarters and duly advised of his *Miranda* rights. He made several statements. The first was that all he did was carry Stamps' groceries to her apartment and then leave. The second was that she said she would give him $5 for carrying her groceries but then refused to do so; he threw her down on the floor, her body or head hitting a dresser; he tied her hands with an apron and forcibly removed $5 from her underclothing, cutting her girdle from her body with a knife. The second version was later recorded on tape. Defense counsel objected to having the jury hear the tape because the *corpus delicti* had not been established, but the objection was overruled and the tape was played for the jury.

The chief deputy coroner testified that the cause of death was asphyxiation

---

[1] The second and the fourth assignments of error assert the same error: that the evidence was insufficient to prove purpose to kill. They are worded as follows:

"SECOND ASSIGNMENT OF ERROR:

"The judgment of conviction is contrary to law and to the due process clause of the Fourteenth Amendment to the Constitution of the United States in that there was insufficient evidence adduced to establish each and every element of the offense beyond a reasonable doubt."

"FOURTH ASSIGNMENT OF ERROR:

"The trial court erred in overruling of appellant's motions for judgment of acquittal of aggravated murder under Crim. R. 29."

resulting from a heavy weight compressing the decedent's back or chest while she was on the floor. This weight could have been a person kneeling or sitting on her upper torso, and it would have caused death in a minute or two. The body had multiple fresh marks or abrasions, indicating blows to the head, arms, torso and legs from various directions. Some marks on her arm indicated the decedent tried to defend herself against an attack.

The defense was alibi, several witnesses testifying that defendant was with them during the period when Stamps was killed. Defendant denied all of his prior statements, asserting that he gave those versions in exchange for being let alone. He testified that the entire taped story was rehearsed and supplied by the police.

The jury was instructed on aggravated murder in the commission of a robbery and on involuntary manslaughter (a death proximately resulting from the commission of robbery). The court's instructions were in writing, and copies were sent to the jury room.

Jury deliberations began late on a Friday afternoon and continued for about one hour and forty-five minutes. The jury was released for the weekend after they were clearly instructed, as they had been told before, not to discuss the case with anyone under any circumstances. On Monday morning, the bailiff answered a telephone call from Eli Namanworth, an attorney not associated in any way with the trial. According to the bailiff, Namanworth said that he had been called on the phone over the weekend by one of the jurors, Alden E. Yelmgren, a friend, and asked whether if there was intent to rob a person and a death followed, the offense would be aggravated murder, murder or some lesser included offense. Namanworth asked Yelmgren why he was interested in "a question of that sort"; upon discovering that Yelmgren was on a jury then deliberating on a homicide case, Namanworth immediately terminated the conversation.[2] He reported the incident to the bailiff on Monday morning.

Namanworth was not called to court and did not testify in person; Yelmgren did, admitting that he made the call because he was confused by the relationship between a purposeful murder and an involuntary manslaughter. The source and nature of his confusion is not entirely clear, but he may have been misled by the word "involuntary" used in connection with a robbery-related death when the robbery was "voluntary." He independently consulted an elementary book on law used by his son in an engineering course at the University of Cincinnati. Receiving no satisfaction from that, he called Namanworth. Yelmgren testified that Namanworth told him nothing about the law and promptly terminated the phone conversation. In answer to further questions, Yelmgren stated that he would

---

[2] Defendant argues that two aspects of the bailiff's report are significant: according to the bailiff, Yelmgren asked about murder as well as the two crimes on which the jury had been instructed, and Namanworth said he "briefly got into it," referring to the question of the relationship between the purposeful murder and involuntary manslaughter. We do not believe that either of these is significant, principally because the bailiff's statement was hearsay and Yelmgren's testimony about the phone conversation was a direct report by one of the participants. Further, whatever Yelmgren read or heard, his impression was that the law book did not discuss the pertinent Ohio law and that Namanworth "didn't tell me anything." We are not willing to overthrow the trial court's ultimate conclusion that Yelmgren "did not obtain any definition or any statement of the law in his search outside of the courtroom that would have tainted his views in this case," or the trial court acceptance of Yelmgren's promise to put out of his mind anything he had heard over the weekend and to follow the law as stated by the court.

put out of his mind anything Namanworth told him and follow the law as stated by the court, and that nothing in his weekend experience outside the jury room had in any way influenced his opinion in the case. It developed that Yelmgren was foreman of the jury.[3]

A voir dire examination of the entire

[3] The record discloses the following when the court called Yelmgren into the courtroom after first discussing with counsel the disclosure about juror misconduct:

"THE COURT: Mr. Yelmgren?

"JUROR YELMGREN: Yes, sir.

"THE COURT: Something rather disturbing has come to our attention in this case, and that is it has been reported to us by Mr. Namanworth that over the weekend you made a call to him personally to discuss certain definitions regarding intent and other matters which are related to the case of State of Ohio versus Charles Browne King; is that correct?

"JUROR YELMGREN: That's correct.

"THE COURT: Mr. Namanworth has stated this to the Court this morning and I must ask you what you discussed with him.

"JUROR YELMGREN: Well, actually I would say in the sense of the word it didn't — well, let me review, I believe this thing in the charge was based on aggravated murder, involuntary manslaughter and not guilty. I believe those are the three points. Sometimes when you think about this thing, when you think of involuntary manslaughter and think of the definition of manslaughter you feel that involuntary is a kind of a double negative because I believe manslaughter is the unlawful killing of a person without malice aforethought and you think well, isn't that involuntary.

"THE COURT: Well, let me stop you, what did you ask specifically of Mr. Namanworth and what did he tell you?

"JUROR YELMGREN: Well, he didn't tell me anything. He informed me he had no right to give me any kind of information. I was just interested in what's the difference between involuntary and manslaughter, I can't tell you a thing about these things and that's all there was to it.

"THE COURT: Well, it has also been reported to us that you indicated that you had certain law books at home that you were referring to.

"JUROR YELMGREN: Well—

"THE COURT: What are those books?

"JUROR YELMGREN: Well, I don't know. I had one that — I don't even recall the name of it, but to me it is like everything else, if I go to a doctor and he gives me a prescription I look it up in the medical book to see what the prescription is or if I look at the law book to see if they had anything about involuntary but they did not have any of that kind of thing.

"THE COURT: Do you know the name of the book?

"JUROR YELMGREN: No, it is the one that is used at U.C., actually it was one my son had. He is a graduate engineer and it was one of the requirements to the elementary course in law, but I don't know what the name of it was.

"THE COURT: Did it discuss Ohio law?

"JUROR YELMGREN: No, it didn't, nothing at all, no.

"THE COURT: Well, most of the definitions are provided by the Legislature —

"JUROR YELMGREN: Yeah.

"THE COURT: — and they say what the law is and that you remember that you took an oath that you would follow the law in this case.

"JUROR YELMGREN: Well, that's correct, sure.

"THE COURT: As it is given to you by the Court. Furthermore, you indicated that on voir dire and in my instructions that you would not attempt to investigate this case on your own or obtain additional information. Now that you have attempted to do so, do you feel that you can put any conversation or anything that Mr. Namanworth told you out of your mind, anything that you may have read and follow the law as it has been given to you by the Court?

"JUROR YELMGREN: Oh, certainly, there is no question about that, I mean, you know, there is no —

"THE COURT: Is there anything that you may have read or that you may have undertaken in regard to this case outside the jury room and over the weekend that has in any way influenced your opinion in this case?

"JUROR YELMGREN: Absolutely not, no, sir.

"THE COURT: All right, thank you.

"Mr. Longano?

jury was then conducted by the court, during which no response was made by any juror to questions addressed in general to the jury as a body about any attempt of any third party to contact or talk to any of them about the case, any reading by them or anyone else about the law, any expression of opinion about the case or the law, or any discussion about the law that morning as they gathered to get ready for further deliberations. No juror responded when the court asked whether any one of them felt that he or she could not remain a fair and impartial juror. Defense counsel moved for a mistrial, and the first assignment is that the court erred in overruling it.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution requires that a person accused of a state criminal violation shall be tried before a panel of fair and impartial jurors. *Duncan* v. *Louisiana* (1968), 391 U.S. 145; *Sheppard* v. *Maxwell* (1966), 384 U.S. 333; *Irvin* v. *Dowd* (1961), 366 U.S. 717. Mr. Justice Holmes said in *Patterson* v. *Colorado, ex rel. Attorney General* (1907), 205 U.S. 454, 462:

"The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print."

Ohio prohibits outside influences, if they are demonstrated to be prejudicial. *State* v. *Kehn* (1977), 50 Ohio St. 2d 11 [4 O.O.3d 74], certiorari denied (1977), 434 U.S. 858; *Armleder* v. *Lieberman* (1877), 33 Ohio St. 77; *Farrer* v. *State* (1853), 2 Ohio St. 54. Any communication or contact outside the courtroom or jury room

about the matter at trial between a juror and another person, particularly if connected with one of the parties to the litigation, and any independent inquiry or experiment by a juror about the evidence or the law, violate the juror's duty to limit his considerations to the evidence, arguments and law presented in open court. Any such activity is juror misconduct, a constitutional violation whether viewed under the Fourteenth Amendment to the United States Constitution or Section 10, Article I of the Ohio Constitution.

Not every instance of juror misconduct requires reversal. The misconduct must be prejudicial. While Ohio has not spoken directly to the question of the burden of proof to demonstrate prejudice once the existence of juror misconduct has been established, we believe the better rule is that all juror misconduct is presumed to be prejudicial, and the prevailing party (the state, in our case) has the burden to demonstrate that the misconduct was not prejudicial under the circumstances. This procedure is set forth in *Remmer* v. *United States* (1954), 347 U.S. 227, 229 (the conviction was of willful evasion of federal income taxes) as follows:

"In a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties. The presumption is not conclusive, but the burden rests heavily upon

---

"MR. LONGANO: No questions on behalf of the State, Your Honor.

"THE COURT: Mr. Stone? [Defense counsel.]

"MR. STONE: Sir, isn't it true you have been elected the foreman of the jury?

"JUROR YELMGREN: That's correct.

"THE COURT: Anything further?

"MR. STONE: No.

"MR. LONGANO: No.

"THE COURT: All right. Thank you for your answers, Mr. Yelmgren. If you would take Mr. Yelmgren back and then bring the whole jury in as a panel."

the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant.''

Accord *People* v. *Honeycutt* (1977), 20 Cal. 3d 150, 141 Cal. Rptr. 698, 570 P.2d 1050. Briefly stated, juror misconduct raises a presumption of prejudice, but the presumption may be rebutted.

We believe that the presumption of prejudice was rebutted in the instant case. First, the trial court came to the factual conclusion after hearing from Yelmgren that he was honest and sincere, that he did not obtain any misleading definition or statement of the law from his inquiries outside the courtroom, and that his views were not "tainted." We are not inclined to substitute our judgment for the trial court's about Yelmgren's credibility and impartiality. Second, the other members of the jury were questioned about their knowledge of Yelmgren's independent inquiries and the record fails to disclose any knowledge or influence that would improperly affect their fairness and impartiality when they returned to deliberations. The defense offered no evidence and does not point to any specific failure to rebut the presumption of prejudice. We hold that the trial court did not err in overruling the motion for mistrial. We find no merit in the first assignment of error.[4]

Nor do we find merit in the third assignment of error in which defendant asserts the taped confession was erroneously admitted in evidence before the *corpus delicti* had been established. As we stated in *State* v. *Ralston* (1979), 67 Ohio App. 2d 81 [21 O.O.3d 403], a confession is inadmissible if the *corpus delicti* has not been established. All that is needed, however, is "some evidence," which need not be equal to proof beyond a reasonable doubt or enough to make a *prima facie* case, *State* v. *Black* (1978), 54 Ohio St. 2d 304 [8 O.O.3d 296], tending to show two elements of the body or substance of the crime: (1) the act, and (2) the criminal agency of the act. *State* v. *Edwards* (1976), 49 Ohio St. 2d 31 [3 O.O.3d 18], vacated and remanded on other grounds (1978), 438 U.S. 911. In the instant case, the evidence received prior to the offer of defendant's taped statement tended to prove that Stamps had died by the "agency" of another person (her hands were tied behind her back, she was lying on the floor with her clothing in disarray, and her body was bruised). Further, prior to the defendant's objection to the taped

---

[4] We distinguish *People* v. *Honeycutt* (1977), 20 Cal. 3d 150, 141 Cal. Rptr. 698, 570 P. 2d 1050, from the instant case on the facts. In that case the jury foreman telephoned an attorney friend during a weekend break in deliberations to ask whether involuntary manslaughter was a felony or misdemeanor. He was advised that while certain types of involuntary manslaughter would be treated as a felony, upon sentencing they could be reduced to misdemeanors by reason of the defendant's diminished capacity. This was not entirely accurate, because the charge of involuntary manslaughter in the trial could never become a misdemeanor on sentencing. The jury returned a verdict of guilty of first degree murder. The wrongful contact did not come to light until after the verdict was reported in the media and the attorney became aware for the first time why his friend had asked the question. The California Supreme Court held that the presumption of prejudice was not rebutted, because the juror might have been misled to think that a manslaughter verdict would involve too light a penalty.

The facts also distinguish *In re Beverly Hills Fire Litigation (Kiser* v. *Bryant Electric)* (C.A. 6, 1982), 695 F.2d 207, because in that case the juror investigated the aluminum wiring in his own house to see whether the connections were in the condition that experts had testified was the case in the Beverly Hills fire. This investigation brought to at least one juror extraneous information that was not formally introduced to an open court. No such extraneous evidence was introduced in the jury deliberations in the trial *sub judice*.

statement, the investigating officer had testified that the defendant had made two oral statements, the first one admitting to have been in the decedent's presence just before her death, and the second admitting to have wrestled her to the floor, to have tied her hands and to have forcibly taken money from her person. The *corpus delicti* was clearly established in due time.

The second and fourth assignments of error attack the sufficiency of the proof of purpose to kill. We hold that with the evidence viewed in the light most favorable to the government, a rational trier of fact could have found this essential element beyond a reasonable doubt. *Jackson* v. *Virginia* (1979), 443 U.S. 307, 319; *State* v. *Eley* (1978), 56 Ohio St. 2d 169, syllabus [10 O.O.3d 340]. The violence inflicted on the decedent before death, evidenced by fresh marks or abrasions on the body, the tying of her hands, and the compression of her chest until she could breathe no more, all tend to prove "a specific intention to cause a certain result," quoting from the definition of "purposely" found in R.C. 2901.22(A). A rational mind could conclude beyond a reasonable doubt that the assailant's purpose was to kill her. There is no merit in the second and fourth assignments of error.

We affirm.

*Judgment affirmed.*

DOAN and KLUSMEIER, JJ., concur.