Filed 4/20/17

CERTIFIED FOR PARTIAL PUBLICATION[*]

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D068743 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD252707) |
| JOHN LANDIS WISMER, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Kenneth K. So, Judge. Reversed.

Law Offices of Scott M. Schlegel and Scott M. Schlegel for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr., and Anthony Da Silva, Deputy Attorneys General, for Plaintiff and Respondent.

_____

[*]     Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of part 2.

A standard instruction given in every California criminal case tells jurors they are not to do any independent research or "conduct any tests or experiments." (CALCRIM No. 201.) The instruction is based on fundamental principles of due process, because if jurors conduct independent investigation, the parties are deprived of the ability to understand and address the results of that investigation, whatever they may be. Independent investigation and experimentation is error when it provides the jury with additional evidence never presented at trial. It is evidence the parties never saw, much less had the opportunity to object or respond to.

In this case, defendant John Wismer was accused of sexual molestation by the nine- and 13-year-old daughters of Wismer's friend and business associate, Richard S. The physical evidence was inconclusive; the prosecution's case turned largely on the credibility of the two girls and, to a certain extent, their parents. The primary incident, involving the younger of the two girls, allegedly took place on an evening in late November. Roughly a week later, police arranged for Richard to make a recorded pretext call to Wismer in which he confronted Wismer with his daughter's allegations.

Although the pretext call failed to elicit any admissions from Wismer, jurors nonetheless focused on the call during their deliberations, listening to it three times and discussing whether Wismer's reaction to the call was consistent or inconsistent with guilt. Frustrated they could not reach agreement, one of the jurors (of Asian descent) took it upon herself to conduct what she characterized as an "experiment" illustrating for her colleagues how a truly innocent person would respond to a fabricated allegation. Using racially charged language, she falsely accused a male Hispanic juror of slapping her

2

behind, punctuating the accusation by claiming he said "he wanted to put his Mexican burrito in my chicken fried rice."

The Asian juror's false accusation and the Hispanic juror's reaction were not part of the evidence in the case, yet they were presented to and considered by the jury in reaching a verdict. This is juror misconduct of a fundamental nature that requires reversal of the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

In November 2013, I.S., then a nine-year-old girl, and A.S., then a 13-year-old girl, lived with their parents, Richard and Cecily S., and two younger brothers in San Diego. A few years earlier, through his occupation as a self-employed private banker, Richard met and became friends with Wismer. Wismer, who was in his late sixties, often visited the family's home on Thursdays to discuss business deals with Richard and have dinner with the family. Wismer was considered an extended family member and a grandfatherly figure to the children.

On November 27, 2013, the Wednesday before Thanksgiving, Wismer came to the family home to have dinner. After the meal, Richard and Wismer went outside to the patio to have drinks and smoke cigars. The four children had a "camp out" in the downstairs playroom with sleeping bags, pillows, blankets, and stuffed animals. Around 8:00 p.m., 13-year-old A.S. went outside to the patio and sat in a chair near Wismer. She asked her father whether she could have a boyfriend. He replied that she could not. Richard then went inside the house to the kitchen or bathroom.

3

While Richard was inside the house, Wismer told A.S. she should go out with the boy. He stroked her thigh, making her feel uncomfortable. When Richard returned to the patio, A.S. went back inside to the camp-out area and watched television with I.S. while their brothers slept. Cecily went upstairs, got into bed, and fell asleep.

Between 12:00 and 12:30 a.m., Richard and Wismer went inside the house. Richard made some soup while Wismer sat on one end of the couch by himself in the living room. I.S. and A.S. were still watching television. When Richard returned from the kitchen, he sat at the other end of the couch. Richard and Wismer watched a movie while they ate. Richard fell asleep.

Wismer went to the camp-out area and told I.S. and A.S. that he was going to leave unless one of them watched the movie with him. While A.S. remained behind, nine-year-old I.S. went with Wismer into the living room, sat on the couch, and watched the movie with him. I.S. was wearing a jacket, shirt, and shorts and had a blanket over her. Richard continued sleeping and snoring at the other end of the couch. After about 15 or 20 minutes, Wismer put his hand underneath I.S.'s blanket and started rubbing her leg. He then put his hand underneath her shorts and underwear and started rubbing her vagina. Feeling uncomfortable, I.S. told Wismer she had to go to the bathroom. She got up and went into the bathroom. She was shocked and did not know what to do.

I.S. returned to the couch, but sat away from Wismer. Richard was still sleeping. Wismer scooted next to I.S. and pulled her close to him. He began rubbing her leg again. She said she was feeling uncomfortable, stood up, walked to the end of the couch, and

4

stood there. Wismer asked her if she was okay. She replied she was not, walked to the camp-out area, and went to sleep with A.S.

Richard woke up and saw Wismer sitting on the couch with his hands on his lap watching the movie. Richard asked him whether it was time for him to go. Wismer replied that it was and they headed outside. However, Wismer's car would not start. They went back inside the house, where Wismer attempted to call his wife several times before finally reaching her. Richard offered to let Wismer sleep in the boys' bedroom because it was not occupied. They went upstairs and Wismer slept on the bottom bunk bed in the boys' bedroom.

In the morning, Wismer declined Cecily's offer of coffee, explaining he had too much to drink the prior night. Wismer left the house when his son arrived to pick him up.

After Thanksgiving dinner, I.S. told Cecily that Wismer had put "his fingers in my privates." Crying, I.S. explained it had happened the prior night on the couch, but that she did not want to get Wismer in trouble. Cecily then told Richard what I.S. had told her. Together they talked to I.S., who repeated what she had told Cecily earlier and also added that Wismer had kissed her.

Cecily then asked A.S. whether Wismer had done anything that made her feel uncomfortable. A.S. told her that the prior night he put his hand on her thigh. She also told her about an incident during which she was in Wismer's car and he put his hand underneath her shirt.

5

Cecily called 911 and reported what her daughters had told her. When officers arrived shortly thereafter, Cecily handed them I.S.'s sweater, t-shirt, and shorts, but not her underwear. In the presence of the officers, A.S. answered Cecily's questions.

On November 29, a pediatrician examined I.S. and found a red bruise under the surface of the membrane of her hymen. I.S. also had visible red petechia on the outer surface of her hymen, which was redder than normal. The pediatrician believed her injuries were consistent with digital penetration.

On December 4, a social worker conducted a forensic interview of I.S., who explained the Wednesday night incident in a manner similar to her subsequent trial testimony, as described above. The same day, another social worker conducted a forensic interview of A.S., who explained the two incidents involving Wismer in a manner similar to her subsequent trial testimony, as described above.

Also on December 4, a police detective arranged for Richard to make a recorded pretext call to Wismer.[1] During the call, Richard explained that I.S. had reported to Cecily and him that Wismer had touched her vagina on November 27 while they were sitting on the couch. After Wismer denied doing so, Richard falsely told him there was a video recording on a surveillance camera that confirmed I.S.'s allegations. Wismer nonetheless did not admit doing anything inappropriate to I.S.

---

[1]    At trial, a recording of the pretext call was played for the jury.

On December 9, another pediatrician examined I.S., but did not observe the red bruise or blood blister. The pediatrician concluded it had healed and that the prior injury was consistent with digital penetration.

DNA analysis of I.S.'s shorts showed her male relatives, and not Wismer, were the primary contributors of DNA. Although there was no DNA evidence showing Wismer was definitely a minor contributor, he could not be excluded as a possible contributor on one of the eight samples retrieved from the shorts.

A second amended information charged Wismer with four counts involving I.S., including one count of unlawful penetration of a child 10 years of age or younger (Pen. Code, § 288.7, subd. (b))[2] and three counts of committing lewd acts on a child under the age of 14 years (§ 288, subd. (a)). It also charged two counts of committing lewd acts on A.S., a child under the age of 14 years (§ 288, subd. (a)). The information further alleged that counts 2 through 6 were committed against more than one victim (§§ 1203.066, subd. (a)(7), 667.61, subds. (b), (c), (e), & (j)(2)) and that count 2 involved substantial sexual contact (§ 1203.066, subd. (a)(8)).

At trial, the prosecution presented evidence substantially as described above. In his defense, Wismer called a number of witnesses who testified regarding his good character and specifically that he was not the type of person given to lewd conduct with children and did not have a reputation for being sexually attracted to children. He also presented several impeachment witnesses who testified that the alleged victims and/or

---

[2]     All statutory references are to the Penal Code unless otherwise specified.

7

their parents were not truthful and/or did not have a reputation for honesty. Finally, he offered the testimony of a physician who stated Wismer had palmar psoriasis such that if he had inserted his hand into I.S.'s underwear, he would have left hundreds of thousands of skin cells on the underwear that would have been detectable by forensic analysis.

The jury found Wismer guilty on counts 1 through 5 and found true the allegations related to those counts. The jury was unable to reach a verdict on count 6. The trial court imposed a total term of 50 years to life in prison, consisting of terms of 25 years to life in prison for each of counts 2 through 5, with the terms for counts 3 and 4 to run concurrently to count 2 and the term for count 5 to run consecutively to count 2. Sentence on count 1 was stayed pursuant to section 654.

## DISCUSSION

### 1. Juror Misconduct

After discharge of the jury following the verdict, several of the jurors met with the prosecutor and defense counsel outside the courtroom. Juror No. 8, a female of Asian descent who served as foreperson of the jury, made statements that provided the basis for a defense motion for an evidentiary hearing regarding jury misconduct. The motion was supported by declarations from defense counsel and a defense investigator.

The foreperson told counsel and the investigator that the jury's discussion focused on the pretext phone calls because there was disagreement as to whether Wismer's reaction to the accusation was a "natural" response. She devised what she characterized as an "experiment" to show that Wismer's reaction was not "natural." Inside the jury room, she falsely accused one of the other jurors, a Hispanic male, of smacking her on

8

the behind while making the racially charged comment that he wanted to put his "Mexican burrito into her chicken fried rice."

The trial court denied the motion for an evidentiary hearing, but permitted defense counsel to file a motion for new trial based on the alleged jury misconduct and to request the release of juror identifying information that would facilitate the submission of juror affidavits. In support of the motion, counsel included an affidavit from Juror No. 8 reiterating her story about the "experiment" involving a fabricated allegation of sexual misconduct leveled at a fellow juror designed to illustrate the "natural" response of an innocent person to a false accusation.[3]

The trial court denied the defense request for release of juror identifying information, concluding that "good cause has not been established to proceed further . . . ." Then, "tak[ing] [Juror No. 8's] statement as indicated," the court stated it had been "unable to find . . . any cases indicating that it's—that kind of discussion is

---

3      Juror No. 8 separately initialed eight of the 13 paragraphs in the affidavit, making handwritten corrections on several of them. The remaining five paragraphs were not initialed, but the numbers were circled and there was a handwritten note at the bottom: "# 4, 5, 6, 7, 9—I am uncomfortable with the statements due to future mis-interpretation or how the statements would affect the case." She nonetheless signed the affidavit without crossing out or correcting any language in the five paragraphs. She also submitted a second affidavit in opposition to the motion for new trial in which she sought to "clarify" a statement in her first declaration regarding evidence about the physical positioning of bodies in defendant's car. There was no attempt to change or clarify any statement about the experiment in the jury room.

     The People do not dispute that Juror No. 8 did what she said she did. Rather, they argue that the false accusation of sexual misconduct by a fellow juror did not constitute an impermissible experiment warranting a new trial. We likewise will accept the undisputed facts as to what occurred and proceed to decide the legal question whether it amounts to jury misconduct. (*People v. Collins* (2010) 49 Cal.4th 175, 242.)

misconduct. It looks to me like it was their attempt at a further critical examination of the evidence . . . that was produced at trial." On that basis the court denied the motion for new trial based on alleged jury misconduct.

As a preliminary matter, we agree with the trial court that no formal evidentiary hearing was required to address the claimed misconduct, nor was it necessary to release juror identifying information to facilitate the submission of additional affidavits. It is true, of course, that the trial court has discretion to order an evidentiary hearing where a criminal defendant moves for a new trial based on alleged juror misconduct. (*People v. Hedgecock* (1990) 51 Cal.3d 395, 415.) Here, however, there were no significant factual disputes to resolve. Juror No. 8—the juror who allegedly engaged in misconduct—was the source of the information, and she initially told both the prosecutor and defense counsel what happened. Everyone including the trial court accepted her story and proceeded to analyze whether her actions amounted to misconduct.

The jurors in this case were instructed pursuant to CALCRIM No. 201 that they should not "do *any* research regarding the case" or "conduct *any* tests or experiments." (Italics added.) The law on the subject, however, is less categorical. As the Supreme Court explained in *People v. Collins, supra,* 49 Cal.4th 175, "[n]ot every jury experiment constitutes misconduct. Improper experiments are those that allow the jury to discover *new* evidence by delving into areas not examined during trial. The distinction between proper and improper jury conduct turns on this difference. The jury may weigh and evaluate the evidence it has received. It is entitled to scrutinize that evidence, subjecting it to careful consideration by testing all reasonable inferences. It may reexamine the

evidence in a slightly different context as long as that evaluation is within the ' "scope and purview of the evidence." ' [Citation.] What the jury cannot do is conduct a new investigation going beyond the evidence admitted." (*Id.* at p. 249, quoting *People v. Bogle* (1995) 41 Cal.App.4th 770, 781.) And this is true regardless whether the new evidence is generated outside the courthouse or inside the jury deliberation room. (*Collins*, at pp. 248-249.)

The problem here is that the accused juror's reaction to Juror No. 8's false accusation was not part of the evidence in the case. When it was presented to the jurors in the deliberation room, it became *new* evidence they were not entitled to consider. It is really no different than if Juror No. 8 found a psychological study on the internet examining how people respond to false allegations of sexual misconduct and played a video clip of a test subject's reaction for her fellow jurors.

What Juror No. 8 was attempting was a controlled experiment. She hypothesized that Wismer was in fact guilty (the independent variable), such that if she accused a truly innocent person (the Hispanic juror) she would observe a different reaction (the dependent variable). It is the nature of a controlled experiment, however, that all other variables must be controlled, i.e., not vary. Here there are numerous variations between the two situations—the setting, the mode of communication, the relationship of the two parties, the age of the alleged victim, the racial overtones in Juror No. 8's accusation— that make this anything but a controlled experiment.

Consider if the prosecutor had called a psychologist to testify about the "normal" reaction of an innocent person accused of sexual molestation based on experimental

11

studies. Assuming the expert's testimony was otherwise admissible, Wismer would have been entitled to cross-examine the expert about the studies, questioning their methodology or the applicability of their conclusions. He could have called another expert to testify in opposition. He was denied that very fundamental opportunity to confront and address the evidence against him because that evidence was generated secretly within the confines of the jury deliberation room. (See *Higgins v. Los Angeles Gas & Elec. Co.* (1911) 159 Cal. 651, 657 [jury experiment is improper where it generates "evidence which it is not possible for the party injured to meet, answer, or explain."].)

In asserting that Juror No. 8 did not engage in misconduct, the People suggested the experiment was "just a hypothetical" akin to asking how a reasonable person would react if falsely accused. Certainly jurors are permitted to " 'use common experiences and illustrations in reaching their verdicts.' " (*People v. Cumpian* (1991) 1 Cal.App.4th 307, 316, quoting *United States v. Avery* (6th Cir. 1983) 717 F.2d 1020, 1026.) But Juror No. 8's experiment was conducted precisely to remove the discussion from the realm of the hypothetical by providing a new concrete standard, observable by every juror, as to how an innocent person responds to a fabricated charge of sexual misconduct. Indeed, it was Juror No. 8's frustration with the fact that the jurors' common experience had thus far failed to produce agreement that prompted her to create a different "common experience" inside the deliberation room, which amounted to new evidence.

When jury misconduct has occurred, prejudice to the defendant is presumed and the burden is on the prosecution to rebut the presumption by showing that the misconduct

12

did not affect the jury's decision. (*People v. Honeycutt* (1977) 20 Cal.3d 150, 156.) Here the People make no serious attempt to argue that if misconduct occurred, it nonetheless did not influence the verdict. To the contrary, Juror No. 8's affidavit itself indicates that the experiment was aimed at a holdout juror, whose vote changed after the experiment was conducted. Under these circumstances, the misconduct of Juror No. 8 in creating new evidence for the jury to consider requires reversal of the judgment.

*2. Evidentiary Issues*

We start with some basic principles. Only relevant evidence is admissible at trial (Evid. Code, § 350), and relevant evidence is admissible unless excluded under the federal or California Constitutions or by statute. (*People v. Carter* (2005) 36 Cal.4th 1114, 1166; Evid. Code, § 351.) The credibility of a witness may be attacked by any party. (Evid. Code, § 785.) In determining a witness's credibility, a jury generally may consider evidence that "has any tendency in reason to prove or disprove the truthfulness of his [or her] testimony," including "[h]is [or her] character for honesty or veracity or their opposites." (Evid. Code, § 780.)

Although Evidence Code section 1101, subdivision (a), precludes the admission of evidence to show a person's character or trait of his or her character "when offered to prove his or her conduct on a specified occasion," that provision does not "affect[] the admissibility of evidence offered to support or attack the credibility of a witness." (Evid. Code, § 1101, subds. (a), (c).) Furthermore, Evidence Code section 1103, subdivision (a), provides: "In a criminal action, evidence of the character or a trait of character (in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct)

13

of the victim of the crime for which the defendant is being prosecuted is not made inadmissible by [Evidence Code] Section 1101 if the evidence is: [¶] (1) [o]ffered by the defendant to prove conduct of the victim in conformance with the character or trait of character . . . ."  A lay (i.e., nonexpert) witness may testify in the form of an opinion if that opinion is based on his or her own perception.  (*People v. Thompson* (2010) 49 Cal.4th 79, 130.)  Nevertheless, under Evidence Code section 352, a trial court may exclude relevant evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

Wismer asserts numerous contentions regarding evidentiary rulings made by the trial court.  In general, we would review these rulings regarding the relevance of evidence and application of Evidence Code section 352 and other rules of evidence for abuse of discretion.  (*People v. Guerra* (2006) 37 Cal.4th 1067, 1140; *People v. Valdez* (2004) 32 Cal.4th 73, 108.)  With regard to most of these, although other judges might have ruled differently, we would conclude the trial court's rulings fell within the permissible exercise of its discretion.  For the benefit of the court on retrial, however, we comment on two particular instances in which the trial court excluded testimony that would have challenged the credibility of the two complaining witnesses.

A

Wismer filed a pretrial motion to admit the testimony of Kristen Colwell regarding a specific incident in 2011 during which I.S. purportedly lied about a boy at school threatening to kill her.  Colwell knew I.S. and A.S. when she was their martial arts

14

instructor. During a recorded interview with a defense investigator, Colwell described how I.S., who seemed sad, told her in a serious manner that a boy at school threatened to kill her. Having concerns whether the statement was true or not, Colwell questioned I.S. further. As the questioning progressed, however, A.S. interrupted them and said, "She's [I.S.'s] just telling you a lie right now." I.S. and A.S. then "laughed and thought it was very funny." Although Colwell was no longer concerned about a boy threatening to kill I.S., she was very concerned about I.S.'s behavior and, in particular, about the seriousness of the lie and how convincing I.S. was when she told it. Colwell was very disturbed by the girls laughing as if it were "no big deal to tell such a horrendous lie."

Wismer argued that Colwell's proposed testimony about I.S.'s story was critical to his defense theory because it directly challenged the credibility of the prosecution's primary complaining witness. It showed how I.S. fabricated the story and how convincing she was when telling a serious lie. He argued the testimony was highly relevant and its significant probative value outweighed any probability its admission would consume excessive time, mislead the jury or cause undue prejudice under Evidence Code section 352. In his view, the testimony would assist the jury in determining I.S.'s credibility and, in particular, her lack of honesty and veracity regarding her accusations against him.

In arguing that Colwell's testimony should not be admitted, the prosecution asserted that because joking was not a crime and did not involve moral turpitude, specific conduct by I.S. was inadmissible to impeach her credibility. It also contended the defense did not prove that I.S.'s statement was actually untruthful. In any event, the

15

prosecution maintained the trial court should exclude Colwell's testimony about the incident pursuant to Evidence Code section 352 because the incident was a collateral matter that would require a trial within a trial (i.e., probable undue consumption of time and confusion of issues), there was no way to independently verify that I.S. lied about the threat, and the incident would have very little probative value, having occurred when I.S. was about six years old.

Colwell was allowed to testify she taught martial arts to I.S. and A.S. over a six-month period in 2011, a period long enough for her to form an opinion regarding I.S.'s honesty. She offered her opinion that I.S. "likes to tell lies and manipulate." However, relying on Evidence Code section 352, the trial court excluded any testimony about the specific incident in which I.S. lied about a death threat at school.

We agree with Wismer that the court abused its discretion by excluding Colwell's testimony about the specific incident during which I.S. lied about a boy threatening to kill her. As the primary alleged victim in this case, I.S.'s credibility was crucial to the jury's determination of the charges against Wismer. Absent compelling physical evidence at trial showing Wismer committed the charged offenses against I.S., the jury necessarily relied, in large part, on I.S.'s credibility in deciding his guilt on counts 1 through 4. In the incident about which Colwell would have testified, I.S. implicitly admitted telling a serious lie.

In a case of this nature, this was important evidence the jury was entitled to hear. Although the court allowed Colwell to testify it was her opinion that I.S. was not honest, the jury had no other evidence on which to adequately assess the basis for her opinion.

16

Had Colwell been allowed to testify regarding the specific incident, the jury would have had a concrete example showing why she believed I.S. could lie to an adult about a very serious matter in apparent disregard of the consequences. The probative value of that excluded testimony was great, while the consumption of time required for that testimony was not; both direct examination and cross-examination would have consumed less than an hour. The People fail to articulate why the jurors were likely to be confused or misled.

We therefore conclude the court abused its discretion under Evidence Code section 352 by finding the probative value of Colwell's proffered testimony was outweighed by the undue consumption of time it would require or the likelihood of jury confusion.

B

Wismer also argues the trial court abused its discretion by restricting the testimony of Steve Ely, a school district employee, about the honesty of Cecily and A.S. and, in particular, excluding evidence on specific incidents. Before trial, Wismer filed a motion to admit Ely's testimony regarding his opinion on the honesty of Cecily and A.S. Wismer also filed a separate motion for admission of testimony by two other school district employees regarding A.S.'s honesty. In an interview with a defense investigator, Ely stated that he had been A.S.'s special education case manager at her school. After A.S. had attended her middle school for only a few months, Cecily wanted A.S. placed at a private school at the public school district's expense. Describing Cecily as a "helicopter parent," Ely stated that she would make things up for A.S. if she thought it would benefit their agenda. She contacted A.S.'s school with complaints about things that did not

17

happen. He also believed A.S. knew how to get Cecily's attention "by feeding her things that will set [Cecily] off against the school."

After Cecily was informed the process to obtain a private school placement for A.S. would take about a year, Ely received a call from Cecily asserting that A.S. had attempted suicide. However, Cecily would not allow him or others to contact the hospital or obtain hospital records so they could work with A.S. Ely believed A.S.'s purported suicide attempt was "convenient" and he would not put it past Cecily "to put [A.S.] up to it to further her agenda of getting [A.S.] into the private school at the cost of the public."

In arguing that Ely's specific-act testimony regarding the alleged suicide attempt should not be admitted, the prosecution asserted that Ely had no basis to conclude Cecily orchestrated A.S.'s apparent suicide attempt in order to get her placed at a private school. It suggested the evidence should be excluded under Evidence Code section 352 because it was a collateral matter that would require a trial within a trial and its potential for prejudice outweighed its probative value. The trial court agreed, and we conclude it did not abuse its discretion in doing so.

But there is one other aspect of Ely's proposed testimony that warrants comment. A.S. claimed the suicide attempt was motivated by a bullying incident at school. Ely stated that the school investigated the allegation but found A.S.'s claim to be false. Although Ely did not think A.S. was necessarily lying, he believed what she perceived had happened had not, in fact, happened.

This specific-act evidence supporting the basis for Ely's opinion regarding A.S.'s credibility did not suffer from the same infirmities as the alleged suicide attempt.

18

Because the school had already conducted an investigation and reached a conclusion, this testimony did not involve the same danger of a protracted trial-within-a-trial. Moreover, it impeached the credibility of one of the two principal complaining witnesses, not a collateral actor (Cecily). On retrial, if the court again concludes Ely's testimony regarding the suicide attempt should be excluded, he should nonetheless be permitted to testify regarding A.S.'s apparently false claim that she had been the victim of a bullying incident.

## DISPOSITION

The judgment is reversed. The matter is remanded for further proceedings consistent with this opinion.

_____
DATO, J.

WE CONCUR:


_____
McCONNELL, P. J.


_____
O'ROURKE, J.

19