DECISION AND JUDGMENT ENTRY
{¶ 1} This is an appeal from a judgment of the Lucas County Court of Common Pleas, following a jury trial, in which appellant, Thomas Kirkwood, was found guilty of one count of rape, classified as a sexual predator, and sentenced to serve nine years in prison. For the reasons that follow, we affirm the judgment of the trial court.
 {¶ 2} On appeal, appellant sets forth the following five assignments of error:
 {¶ 3} "Assignment of Error No. 1: The trial court erred in permitting Emmeco Atkins to testify that she saw [her family doctor] for psychological reasons.
 {¶ 4} "Assignment of Error No. 2: The trial court abused its discretion and violated Mr. Kirkwood's right to fair trial, due process, the defense of his choice, and effective assistance of counsel when it denied his motions to continue the trial date.
 {¶ 5} "Assignment of Error No. 3: The trial court committed error in removing juror Gilbert.
 {¶ 6} "Assignment of Error No. 4: The trial court abused its discretion in denying the defense motion to continue the sexual [offender] classification hearing in order to obtain a second opinion.
 {¶ 7} "Assignment of Error No. 5: A trial court commits reversible error when it permits jurors to ask questions of witnesses."
 {¶ 8} On August 16, 1999, appellant was indicted by a Lucas County Grand Jury on one count of rape, in violation of R.C. 2907.02(A)(2). The charges arose from an incident that took place on February 7, 1999, between appellant and Emmeco Atkins. After several continuances, one of which was due to a change of appointed defense counsel, a jury trial was scheduled to commence on September 13, 2000. On that date, appellant's new defense counsel requested another continuance so that he could secure the testimony of two additional witnesses. After considering the arguments of both defense counsel and the prosecution, the request for a continuance was denied.
 {¶ 9} At trial, testimony was presented by Tomeka Hunter, Emmeco Atkins, and Toledo Patrol Officers Robert Britt and Christopher McQueen. Hunter, one of Atkins's two sisters, stated that she received a telephone call from appellant between 3 a.m. and 4 a.m. on February 8, 1999, during which appellant apologized for having an "altercation" with Atkins earlier that night. Hunter further stated that appellant asked her to get Atkins to "tell the truth and not go to the police," in exchange for $500.
 {¶ 10} Emmeco Atkins testified at trial that appellant called her cell phone at approximately 8 p.m. on February 7, 1999, and invited her to come to his home. Atkins stated that, when she arrived, appellant insisted that she drink beer with him. He then sat with her on the bed, kissed her and said he wanted her "to make him feel good," which she understood to be a request for oral sex. Atkins further stated that when she refused to have sex with appellant, he became angry and threatened to hurt her. She then began performing oral sex on appellant; however, instead of completing the act, she grabbed appellant's penis with her hand and twisted it. She then jumped off the bed and attempted to escape; however, appellant would not let her leave.
 {¶ 11} Atkins testified that, after appellant refused to let her leave the house, she asked to go to the bathroom. When she discovered that appellant's bathroom had no toilet paper, he said he would get some from the car. Atkins further testified that, when appellant left the house, she attempted to go outside; however, appellant pulled out a knife and grabbed her, and they began to scuffle on the ground. Atkins stated that, during the course of the struggle, she was screaming and shouting obscenities at appellant. Atkins further stated that, at some point, she got to her car and drove approximately 10 minutes to the house of her other sister, Cindy, to call 911. Atkins then identified pictures of bruises and cuts on her body as those taken by the Toledo police officers who responded to the 911 call.
 {¶ 12} On cross-examination, a recording of the 911 call was played, after which Atkins admitted that her sister, Cindy, actually placed the call. Atkins further testified on cross-examination that the she did not seek medical treatment for the injuries sustained that night, but she did see her family doctor several weeks later.
 {¶ 13} On redirect, the prosecutor asked Atkins why she sought treatment from her family doctor, to which defense counsel objected, on grounds that the answer would refer to psychological, not medical, treatment. The trial court overruled defense counsel's objection and allowed the witness to answer the question. She responded that she went to her family doctor "[t]o seek psychological help, and also I was having trouble eating and sleeping."
 {¶ 14} Officer Britt testified at trial that he and his partner, Officer McQueen, responded to the 911 call on the morning of February 8, 1999. Britt further testified that when he first saw Atkins, she was upset and angry. Britt stated that Atkins told him she had been assaulted and that appellant had "attempted to force her to perform oral sex."
 {¶ 15} Officer McQueen testified that he took pictures of Atkins's injuries which, in his opinion, were fresh. McQueen further testified that Atkins told him she had performed oral sex on appellant. McQueen stated that he collected Atkins's muddy black jeans as evidence. On cross-examination, McQueen testified that he did not arrest appellant that night because the case was turned over to Toledo Police Detective Michael Schaber for further investigation. McQueen stated that it was Detective Schaber who issued a warrant for appellant's arrest on September 24, 1999, after the grand jury issued an indictment.
 {¶ 16} At the close of McQueen's testimony, the state rested. No witnesses were presented on appellant's behalf at trial. The trial court then dismissed the alternate juror, and the jury began its deliberations.
 {¶ 17} Shortly after the jury retired, it was brought to the trial court's attention that Atkins had seen one of the jurors, Thomas Gilbert, speaking with a "friend" of appellant outside the courtroom. When questioned by the trial court, Gilbert admitted he had spoken to someone during the trial; however, the conversation was about Gilbert's day-care business, and not about the trial. The court allowed Gilbert to return to the jury room.
 {¶ 18} The next day, Court Security Officer Pete Sifuentes told the trial court that, the previous day, he heard an individual that Sifuentes believed was appellant's "friend" say in Gilbert's presence that "It's not a rape, they're boyfriend and girlfriend." In addition, a second security officer, Brad Ford, told the trial court that he saw three men exit the courthouse together on the previous day, and that he was "95% sure" that the men were appellant, appellant's "friend", and juror Gilbert.
 {¶ 19} As a result of this new information, Gilbert was again questioned by the trial court concerning his activities on the previous day. Gilbert denied hearing any remark about appellant and Atkins being "boyfriend and girlfriend," and stated that he was alone when he left the courthouse on the previous day. In addition, appellant's attorney told the court that he, not Gilbert, had exited the courthouse with appellant and appellant's "friend". The trial court then found, over defense counsel's objection, that it was compelled to remove Gilbert from the jury.
 {¶ 20} Gilbert's removal left only 11 jury members on the panel. As a result, the trial court offered appellant the option of either asking for a mistrial or continuing to a verdict with the remaining members of the jury panel. After speaking to appellant, defense counsel stated that appellant wished to proceed to verdict with only 11 jurors. When the verdict was returned, appellant was found guilty of rape as charged in the indictment. A timely notice of appeal was filed.
 {¶ 21} Appellant asserts in his first assignment of error that the trial court erred by permitting Emmeco Atkins to testify that she sought treatment from her family physician for a psychological problem. In support thereof, appellant argues that the trial court permitted the prosecutor to inquire on redirect as to matters that were beyond the scope of cross-examination, resulting in prejudice to appellant for two reasons: (1) the jury deliberated for five hours before reaching a verdict; and (2) the defense had no "sensible way" to challenge the implication that Atkins suffered psychological harm due to appellant's actions.
 {¶ 22} Generally, the scope of redirect examination is limited to matters inquired into by the adverse party on cross-examination. Holtzv. Dick (1884), 42 Ohio St. 23, paragraph seven of the syllabus; Michamv. Micham (Sept. 30, 1998), Lucas App. No. L-97-1308. Ultimately, however, the limits of inquiry on redirect are left to the sound discretion of the trial court. Id.; Holtz, 42 Ohio St. 23, supra. An abuse of discretion connotes more than a mere error of law or judgment, instead requiring a finding that the trial court's decision was unreasonable, arbitrary, or unconscionable. Blakemore v. Blakemore
(1983), 5 Ohio St.3d 217, 219.
 {¶ 23} In this case, on cross-examination, defense counsel questioned Atkins as to whether she was treated by a doctor for her injuries after February 7, 1999. The witness replied that she did not go to the hospital; however, she did seek treatment "a couple of weeks" later from her family physician. Defense counsel did not inquire as to why Atkins sought treatment from her family doctor.
 {¶ 24} On redirect, the prosecutor inquired as to why Atkins visited her family doctor, to which defense counsel objected, stating that the question was designed to elicit that Atkins suffered from emotional distress relative to the events of February 7, 1999. The prosecution argued that the question was proper because defense counsel raised the issue of Atkins's visit to her family doctor during cross-examination. The trial court responded as follows:
 {¶ 25} "The Court agrees [with the prosecutor]. It will overrule the objection. [Defense counsel] specifically asked the question when she [Atkins] sought medical attention and who she saw. It's a proper question for redirect or proper area for redirect."
 {¶ 26} Defense counsel renewed his objection on the basis that Atkins was asked during cross-examination only whether she sought treatment for physical injuries. The court responded as follows:
 {¶ 27} "You asked her on cross-examination whether she sought medical attention. She said two weeks after the events. Who did you see? Her family physician. Who was it? * * * They have a right to inquire of this on redirect."
 {¶ 28} After the above exchange took place, Atkins testified on redirect that she went to her family doctor "[t]o seek psychological help, and also I was having trouble eating and sleeping." No further inquiry was made by the prosecution. Thereafter, on recross, defense counsel and Atkins engaged in the following exchange:
 {¶ 29} "[Defense counsel]: Isn't [your doctor] a general practitioner, not a psychologist, * * *
 {¶ 30} "[Atkins]: True.
 {¶ 31} "[Defense counsel]: But that's who you sought?
 {¶ 32} "[Atkins]: I went to him for the noneating and sleeping, in which he prescribed medication, and he also gave me the name of the psychologist I seeked [sic]."
 {¶ 33} This court has examined the record in this case and, given the sequence of events as set forth above, including the narrow scope of the prosecution's inquiry and the fact that defense counsel elicited identical testimony from Atkins on recross, we cannot say that the trial court abused its discretion by allowing the prosecutor to inquire as to why Atkins visited her family physician. Accordingly, the trial court did not err by overruling defense counsel's objection to such questioning, and appellant's first assignment of error is not well-taken.
 {¶ 34} Appellant asserts in his third assignment of error that the trial court abused its discretion when it removed juror Gilbert after the jury began its deliberations, thereby causing him to make the "improper and unfair choice" of either accepting a mistrial or waiving his constitutional rights and proceeding to a verdict with less than 12 jurors.
 {¶ 35} "The Due Process Clause of the Fourteenth Amendment to the United States Constitution requires that a person accused of a state criminal violation shall be tried before a panel of fair and impartial jurors." State v. King (1983) 10 Ohio App.3d 161, 165, citing Duncan v.Louisiana (1968), 391 U.S. 145. Generally, in a criminal case, "any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial * * *." Id. (Citation omitted.) In cases that involve a determination as to the effect of outside influence on a juror, the trial court is granted broad discretion in dealing with the contact and deciding whether to remove the affected juror or grant a mistrial. State v. Phillips (1995), 74 Ohio St.3d 72,89.
 {¶ 36} As set forth above, the trial court questioned Gilbert on two occasions as to the extent and nature of his contact with appellant's "friend." In addition, the court questioned two court security officers who each stated they had seen Gilbert with appellant's "friend." Defense counsel then expressed disagreement with the officers' version of events, and argued strongly against removing Gilbert from the jury, after which the trial court stated:
 {¶ 37} "with the presumption of taint, the presumption of prejudice and the fact that both parties are entitled to a fair trial, it's this Court's opinion that this juror has to be removed. While we can't say conclusively, I think there is enough contact, enough issue, particularly with the testimony of [the two security officers] that the Court has to remove this juror."
 {¶ 38} Appellant urges this court to find that the trial court's factual determination that Gilbert's impartiality was so compromised that he could not remain on the jury was erroneous. However, after reviewing the entire record, including the trial court's statement as set forth above, this court is not inclined to substitute our judgment for that of the trial court on the issue of Gilbert's credibility and impartiality. See Pons v. Ohio State Med. Bd. (1983), 66 Ohio St.3d 619, 621.
 {¶ 39} Upon consideration of the foregoing, we cannot say that the court abused its discretion by finding that Gilbert's impartiality was compromised and thereafter removing him from the jury. Any remaining issue as to whether appellant was unduly prejudiced by Gilbert's removal was waived when appellant elected to forego his absolute right to a mistrial and proceed to verdict with only 11 jurors. Appellant's third assignment of error is not well-taken.
 {¶ 40} Appellant asserts in his second assignment of error that the trial court erred by denying his motion for a continuance, made on the first day of trial, so that he could locate two additional defense witnesses.
 {¶ 41} Generally, the decision of whether to grant a continuance is within the sound discretion of the trial court. State v. Unger (1981),67 Ohio St.2d 65, syllabus. In making such a determination, considerations such as the court's right to control its own docket and the public's interest in the prompt and efficient dispatch of justice should be weighed against potential prejudice to the defendant. Id. at 67, citing Ungar v. Sarafite (1964), 376 U.S. 575, 589. In addition, the trial court is under no obligation to adapt its schedule to accommodate defense tactics and strategy. Id., at 68-69.
 {¶ 42} The record in this case shows that defense counsel asked for a continuance on the first day of trial so that he could locate the investigator who interviewed eyewitness Holmes before she died. The prosecutor responded that a written account of Holmes's interview was to be admitted into evidence, pursuant to an agreement between the state and appellant's prior defense counsel; however, in exchange for the admission of Holmes's statement, appellant's prior counsel agreed not to present a defense of consent at trial. Defense counsel then stated that he was unaware of prior counsel's agreement until days before the trial was to begin, although he had been appointed as substitute counsel two months earlier. Defense counsel argued that, without the investigator's testimony, he could not adequately represent appellant at trial, because he believed a consent defense was in appellant's best interest.
 {¶ 43} The trial court stated that, if appellant chose to break prior counsel's agreement and present a consent defense, the prosecution would be released from the agreement to admit the written statement. The trial court further stated that, without the agreement, neither Holmes's written statement nor the investigator's testimony as to what Homes told him would be admitted at trial, since both were hearsay. At that point, defense counsel asked for a two-week continuance to find another eyewitness, Frank Robinson. In response, the trial court delayed the proceedings by several hours and ordered the state to cooperate in locating the witness; however, it did not rule on appellant's requests for a continuance. Later, after consulting with appellant, defense counsel told the court that appellant agreed not to present a consent defense "with the understanding that the [written] statement will be admitted into evidence as a stipulation from the state."
 {¶ 44} This court has reviewed the entire record of proceedings and, on consideration thereof, finds that the trial court did not abuse its discretion by denying appellant's request for a continuance on the first day of trial, particularly where the need for a continuance apparently arose as a result of a change in defense strategy. In addition, we note that if appellant had accepted a mistrial upon the dismissal of juror Gilbert instead of electing to proceed with 11 jurors, he could have avoided any negative impact resulting from the denial of his request for a continuance. Appellant's third assignment of error is not well-taken.
 {¶ 45} Appellant asserts in his fourth assignment of error that the trial court abused its discretion when it refused to delay the sexual offender classification hearing to allow appellant to obtain a "second opinion" as to whether or not he should be classified as a sexual predator. Appellant argues that he was not aware of the need for another expert opinion until shortly before the hearing on November 3, 2000, because Dr. Houtler's report was not filed until October 24. In support thereof, appellant relies on State v. Eppinger (2001), 91 Ohio St.3d 158.
 {¶ 46} In Eppinger, the Ohio Supreme Court held that "[a]n expert witness shall be provided to an indigent defendant at an R.C. 2950.09(B)(1) sexual offender classification hearing if the court determines, within its sound discretion, that such services are reasonably necessary to determine whether the offender is likely to engage in the future in one or more sexually oriented offenses within the meaning of R.C. 2950.01(E)." Id., syllabus.
 {¶ 47} Appellant's reliance on Eppinger, supra, is misplaced. The issue presented to court for consideration on appeal is not whether appellant was entitled to have a second opinion, but whether the trial court erred by not granting appellant additional time to obtain an independent psychological evaluation before holding the sexual offender classification hearing.
 {¶ 48} As set forth above, the decision of whether to grant a continuance is within the sound discretion of the trial court.Unger,
supra, 67 Ohio St.2d at the syllabus. An abuse of discretion connotes more than a mere error of law or judgment, instead requiring a finding that the trial court's decision was unreasonable, arbitrary, or unconscionable. Blakemore, supra, 5 Ohio St.3d at 219.
 {¶ 49} The record shows that the jury verdict was rendered on September 15, 2000. The trial court ordered appellant to submit to a psychological evaluation by Dave Houtler, Ph.D., of the Court Diagnostic and Treatment Center, prior to the sexual offender classification hearing, which was originally scheduled for October 13, 2000. When appellant refused to be interviewed by Dr. Houtler prior to October 13, the hearing was rescheduled for October 27, 2000. The interview finally took place on October 15, 2000.
 {¶ 50} On October 24, 2000, Dr. Houtler filed a report in which he found that, in his opinion, there was a 50 percent probability that appellant would engage in future sexual offending behavior. The report did not recommend that appellant be classified as a sexual predator. Dr. Houtler based his opinion on a three-hour interview with appellant and his review of the indictment, the Toledo Police Department Supplemental Crime Report, a confidential polygraph report, the victim's written statement, appellant's criminal history, and the results of psychological testing.
 {¶ 51} After yet another delay, a combined sexual predator determination and sentencing hearing was held on November 3, 2000. On that date, defense counsel asked for one more continuance so that appellant could seek a "second opinion" from an independent psychologist. The trial court responded as follows:
 {¶ 52} "The matter was originally scheduled for sentencing, as well as hearing on the sexual [offender] classification on October 13. This matter was then continued and defendant and defense counsel were in court on that day. The matter was continued to Friday, October 27th, for the reason that I had received a letter from Dr. Houtler who was performing the evaluation who had indicated that the defendant when initially appearing at his office had refused to talk to him because he had not talked to [his attorney]. * * * This hearing was thus delayed for that period of time. Neither September 15th when I scheduled this matter for the court Diagnostic and Treatment, nor on the 13th of October, nor on the 27thof October did defense make a request. The Court views this as simply another opportunity to delay this matter, and the Court is going to deny the defendant's motion."
 {¶ 53} This court has reviewed the entire record of proceedings and, upon consideration thereof, finds that appellant chose, as a matter of strategy, to wait and evaluate Dr. Houtler's report rather than seek an independent evaluation at the earliest opportunity. In addition, we note that the delayed release of Dr. Houtler's report, as well as the continuation of the first hearing date, was a direct result of appellant's refusal to participate in the psychological evaluation prior to October 15, 2000. Accordingly, we cannot say that the trial court abused its discretion by denying appellant's last minute request for a continuance to obtain an independent psychological evaluation. Appellant's fourth assignment of error is not well-taken.
 {¶ 54} Appellant asserts in his fifth assignment of error that the trial court erred as a matter of law by allowing jurors to question witnesses during the course of the trial. Appellant does not argue that any specific practice employed by the trial court in this case resulted in error, but rather relies on State v. Gilden (2001), 144 Ohio App.3d 69, in which the First District Court of Appeals held that "questioning by jurors is so inherently prejudicial that it should not occur under any circumstances." Id. at 71.
 {¶ 55} In State v. Fisher (2002), 99 Ohio St.3d 127, the Tenth District Court of Appeals asked the Supreme Court of Ohio to consider the question of whether the practice of allowing jurors to question witnesses is "inherently prejudicial." The case was certified by the Tenth District as being in conflict with that of the First District Court of Appeals inState v. Gilden, supra. In deciding the question presented to it, the Supreme Court held that:
 {¶ 56} "the practice of allowing jurors to question witnesses is a matter committed to the discretion of the trial court. To minimize the danger of prejudice, however, trial courts that permit juror questioning should (1) require jurors to submit their questions to the court in writing, (2) ensure that jurors do not display or discuss a question with other jurors until the court reads the question to the witness, (3) provide counsel an opportunity to object to each question at sidebar or outside the presence of the jury, * * * (4) instruct jurors that they should not draw adverse inferences from the court's refusal to allow certain questions, and (5) allow counsel to ask followup questions of the witnesses." State v. Fisher, 99 Ohio St.3d at 135.
 {¶ 57} In this case, before testimony began, the trial court explained the process of jury questioning to the jury members as follows:
 {¶ 58} "The procedure for asking questions of a witness is as follows: You will write your questions on a piece of paper. Do not identify yourself in any way. do not put your jury seat number your initials or in any other form identify yourself. The questions that will be asked of the witness must be in accordance with the Ohio Rules of Evidence.
 {¶ 59} "If a question is permissible under the Ohio Rules of Evidence, it will be read by the court to the witness, although it may be rephrased to meet the requirements of the rules of evidence. If you do not have a question, I want you to write no question or something similar on a piece of paper and send it down to the end of the row so that all jurors are turning in a piece of paper at the same time. Those papers will be collected, brought to the bench. I will examine them with counsel for both parties.
 {¶ 60} "If you've written out a question and it's not asked by the Court, please do not be offended. As I indicated, all evidence that comes before you must meet the Ohio Rules of Evidence, and it is for this court and this Court alone to determine what is and what is not admissible evidence.
 {¶ 61} "If your questions is not asked, don't hold it against the attorneys, because it's again this Court's function to make that determination.
 {¶ 62} "If the question can't be rephrased to make it admissible, it simply will not be asked and you will not be given an explanation other than the one I'm giving you now, and that is it doesn't meet the Ohio Rules of Evidence.
 {¶ 63} "If a question is asked of the witness, the attorney for the — for both parties will have an opportunity to ask follow-up questions of that witness as it pertains to the question that was asked * * *."
 {¶ 64} This court has reviewed the entire record of proceedings, including the trial court's remarks to the jury as set forth above and, upon consideration thereof and the law, finds that the trial court did not abuse its discretion or otherwise prejudice appellant's right to a fair trial by allowing jurors to question the state's witnesses during the course of the trial. Appellant's fifth assignment of error is not well-taken.
 {¶ 65} The judgment of the Lucas County Court of Common Pleas is hereby affirmed. Court costs of these proceedings are assessed to appellant, Thomas Kirkwood.
Judgment Affirmed.
Peter M. Handwork, P.J., Richard W. Knepper, J., and Mark L. Pietrykowski, J., concur.