[Cite as *State v. Straughan*, 2021-Ohio-1054.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| STATE OF OHIO | C.A. No. 29549 |
|---|---|
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| JEFFREY ALLEN STRAUGHAN | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | CASE No. CR 18 07 2870 |

DECISION AND JOURNAL ENTRY

Dated: March 31, 2021

CARR, Presiding Judge.

{¶1} Defendant-Appellant Jeffrey Allen Straughan appeals from the judgment of the Summit County Court of Common Pleas. This Court affirms.

I.

{¶2} Following an altercation with the victim in a fast food parking lot on August 14, 2018, an indictment was filed charging Straughan with felonious assault in violation of R.C. 2903.11(A)(2) and 2903.11(D)(1)(a) and aggravated menacing in violation of R.C. 2903.21(A) and 2903.21(B). A firearm specification accompanied the felonious assault charge. In March 2019, a supplemental indictment was filed and Straughan was charged with the discharge of a firearm on or near prohibited premises in violation of R.C. 2923.162(A)(3) and 2923.162(C)(2). A firearm specification accompanied this count as well.

{¶3} The matter proceeded to a jury trial. The jury found Straughan guilty of all the charges, and the trial court sentenced him accordingly. Straughan has appealed, raising five assignments of error for our review.

II.

## ASSIGNMENT OF ERROR I

DEFENDANT'S CONVICTIONS FOR FELONIOUS ASSAULT, AGGRAVATED MENACING, AND DISCHARGE OF FIREARM ON OR NEAR PROHIBITED PREMISES ARE BASED UPON INSUFFICIENT EVIDENCE AND ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶4} Straughan argues in his first assignment of error that his convictions are based upon insufficient evidence and are against the manifest weight of the evidence. With respect to sufficiency, he asserts that there was insufficient evidence that the bullet that he fired traveled across a road. In addition, Straughan claims that the State failed to establish that he did not act in self-defense. With respect to the weight of the evidence, it appears that Straughan asserts that the jury was unreasonable in its resolution of the conflicting testimony.

## Background

{¶5} There is no dispute that on August 14, 2018, Straughan fired his gun at the victim; instead, the issues in this case center on the circumstances surrounding the firing of that weapon. These issues include whether the bullet actually traveled across the road and whether Straughan fired the weapon in self-defense. Unfortunately, as is often the case, the eye-witness accounts of the events are not in agreement about the facts relevant to these circumstances.

{¶6} Late in the afternoon or early evening on August 14, 2018, the victim, a man in his late 30's, who was homeless at the time, walked into a pizza shop that Straughan owned. Straughan, who was described as being older and shorter in stature than the victim, was not

working at the shop at the time. The victim asked an employee if he could have some free pizza or a cigarette and also asked for a job application. The victim grabbed what he testified was one dollar, and Straughan characterized as $9.00, from the tip jar and left the business. The employee noticed the missing money and reported it to Straughan. Straughan drove down to the shop and viewed the surveillance video. He then drove around a little to try to locate the victim. Being unable to do so, he decided to head home. On his way home, he spotted the victim in the parking lot between Burger King and Arby's. The area is a busy commercial area described as being heavily congested with people.

{¶7}    After leaving the pizza shop, the victim went to a Burger King on State Road in Cuyahoga Falls. He asked for a job application there as well. While the victim denied that he then asked customers in the parking lot for food, eyewitnesses did report the victim coming up to their car and asking for food or money. An eyewitness in a car, K.S., described the victim as agitated and angry and somewhat difficult to understand. While the victim did not make any threats towards K.S., his behavior made her feel threatened.

{¶8}    The victim, according to his trial testimony, then saw Straughan, who was near his parked vehicle. Straughan had a gun in a holster on his hip. Straughan admitted to openly carrying the weapon at all times. The victim described Straughan as being "aggravated as hell." The victim recognized Straughan as being associated with the pizza shop. The victim indicated that Straughan was yelling and calling the victim a thief. Straughan told the victim he was not welcome at the pizza shop. The victim stated that Straughan kept threatening to shoot the victim. Straughan had a phone in his hand and said he was going to call the police. The victim and Straughan began to yell back and forth. Because Straughan kept threatening to pull his weapon on the victim, the victim pushed Straughan with both hands. Then Straughan pointed the gun at the victim. The

victim indicated that he was crossing the street going away from Straughan but turned and was facing Straughan when Straughan fired the weapon. The victim was not injured but the shirt he was wearing, near the area that would cover the small of the back, had four holes in it that the victim testified were not there prior to the shooting. The holes were in a horizontal line on the shirt. Gunshot residue was found in that area of the shirt. A police officer testified that he believed that the holes were from a bullet and that the left most hole was the entry hole. The officer believed the shirt must have been bunched up such that the one bullet caused the four holes.

{¶9} When the victim detailed the incident to police, he told police that, when the victim was exiting Burger King, Straughan started approaching the victim and was accusing him of stealing a wallet from the pizza shop. The victim told the officer that there was then a back and forth verbal altercation. At some point, Straughan drew the firearm and pointed it at the victim. The victim started to walk away to cross the street. The victim turned and saw Straughan had holstered the weapon. The victim went back towards the parking lot and Straughan and another verbal argument occurred. Straughan drew the gun again and the victim started to walk back towards State Road. It was at that point the gun was fired, according to the victim's statement to police. Thus, the victim was facing away from Straughan and towards State Road. The victim told police that he thought Straughan walked up and put the gun into the victim's back and pulled the trigger because he felt a brush of air go by his back. The victim then began to re-approach Straughan. At that point a manager from Burger King came out to keep the two men separated and police arrived around the same time. Police located a 45-caliber shell casing near the exit of the shared parking lot. Police were unable to locate a bullet; however, Straughan's gun was recovered. When it was taken into custody, it was jammed, meaning "the slide was locked back because it had a round sticking straight up." Thus, without clearing the jam, another round could

not be fired.  It was a 45 semi-automatic pistol and was test-fired and deemed operable.  The shell casing was determined to be fired from that weapon.

{¶10}  Straughan relayed the events differently.  Straughan testified that he had some health issues from his prior service in the military.  He indicated that he had a bad shoulder, knee problems, and ankle problems.  He testified that his right leg was more affected and that the leg injury caused him to not to be able run or back up quickly.    Straughan also averred that he had what he described as "anger issues" for which he was on Prozac at the time of the altercation.

{¶11}  Once he located the victim, Straughan observed the victim arguing and screaming with the people in K.S.'s car.  Straughan asserted that he got out of his car to call 911.  While only one 911 recording from Straughan was presented, he claimed to have called twice.  When K.S.'s car moved, the victim moved towards Straughan.  Straughan may have said, "You stole from me."  The victim then pushed Straughan and told him not to talk to the police.  Straughan fell up against his car.  Straughan described the victim as being angry.  The victim was screaming at Straughan not to call the police and told Straughan that the victim was going to stop Straughan from doing so.  The victim then pushed Straughan again.  Straughan told the victim not to assault Straughan again or he would defend himself.  The victim pushed Straughan a third time and Straughan repeated himself.  The victim then came at Straughan a fourth time.  Straughan dropped his phone and drew his gun.  When Straughan pulled the weapon, the victim backed off and started walking away.  Straughan then picked up his phone and started to call 911 again.  The victim then turned around towards Straughan and began running at him.  Straughan dropped his phone again, pulled his weapon, and fired.  Straughan thought the victim said, "I'm going to kill you."  The victim's fists were clenched.  After Straughan fired the weapon, the victim ran out into the middle of the street. Straughan testified that he was afraid that the victim would kill him and that he had no

choice but to fire the weapon. Straughan indicated that the sound of the gun firing was quieter than normal and that when he fired it, it jammed. He also believed that the gun had "squibbed[.]" An expert with the Ohio Bureau of Criminal Investigation testified that a "squib load is a cartridge when it fires, it has significantly less – the projectile has significantly less velocity than a normal cartridge." Sometimes it can get stuck in the barrel or it exits the barrel at decreased velocity.

{¶12} The next day or so, Straughan went back to the scene and found a bullet where he had been standing when he fired the weapon. Straughan did not turn the bullet over to the police as he did not know it was evidence as he had not then been charged with a crime. Straughan intended to keep the bullet and make a necklace out of it. While Straughan was in jail, his wife knocked over the plastic bin that contained the bullet and they were then unable to find it again.

{¶13} At the scene, Straughan also made a statement to police. Straughan told police that he fired his weapon at the victim and that he was afraid that the victim was going "kick [his] a**" or punch him. Straughan relayed a similar sequence of events to police as to what he testified to at trial: Straughan told the officer that the victim pushed Straughan a few times, and, that, ultimately, when the victim turned around and charged at Straughan, Straughan fired at the victim. Straughan did not complain to police of any injuries or request an ambulance. Based on the direction Straughan indicated he fired, the officer testified that the bullet could have gone across Schiller Avenue or State Road.

{¶14} In addition, several other witnesses saw a portion of the events. K.S. was in her car with her daughter and her grandson. They were parked in front of the Burger King and getting ready to go through the drive-through when the victim walked up to K.S.'s car window mumbling about how they would not give him food. He was difficult to understand. The victim asked K.S. for food and money and she said she did not have any for him. The victim seemed angry and

frustrated. The victim left and K.S. started to pull towards the drive-through when K.S.'s daughter saw the victim arguing with Straughan. K.S. could observe some of it through her rear-view mirror. K.S. could not hear much but did hear Straughan say he was calling the police. Then, K.S.'s daughter said that Straughan had a gun. K.S. saw Straughan lower the gun and heard, "Stay away from me[.]" Every time the victim would approach Straughan, Straughan would raise the gun again. During this time, K.S.' daughter called 911. K.S. heard a gunshot; when she turned around, she saw the victim standing facing Straughan. K.S. did not observe any physical confrontation between the two nor did she hear the victim threaten Straughan.

{¶15} K.S.'s daughter testified that as they were pulling towards the drive-through, she heard shouting. She said Straughan was yelling about the victim stealing from Straughan's business. K.S.'s daughter then saw Straughan pull out a gun and say that he would use it in self-defense. At that point K.S.'s daughter decided to call 911. The victim backed off and Straughan put the gun away. K.S. observed both the victim and Straughan pushing each other. The victim continued to run towards Straughan and Straughan warned him that he would use the weapon in self-defense if the victim did not stop. K.S.'s daughter saw Straughan pull the gun a second time and then she heard a shot. When the shot was fired, she saw the victim and Straughan facing each other and they were about 10 feet apart.

{¶16} A home health aide who was in the car with a client also observed part of the incident. They were driving past Burger King when the home health aide heard a gunshot. The home health observed Straughan pointing a gun at the victim as the victim was walking across the street. Straughan was near the apron of the parking lot and the victim was walking away across the street. The home health aide did not observe any physical confrontation and only heard yelling. After the victim had gone a bit down the road, he came back towards Straughan to argue some

more. To the home health aide, it appeared that Straughan and the victim were antagonizing each other.

{¶17} That day, a Burger King employee also witnessed some of the events. As she pulled into the Burger King parking lot, she heard an argument. She saw the two men arguing. She then observed the victim push Straughan. The Burger King employee called the police. She also saw a gun drawn and the victim running across State Road. At the time the Burger employee heard the gunshot, she saw Straughan pointing the gun across State Road, and the victim running away across the street. She clarified that the victim was facing away from Straughan at the time the gun was fired. She had no doubt that the gun was fired over State Road.

{¶18} At the time of the incident, J.C. was in his car with his two children. While he was stopped at a light, he saw two men having a verbal altercation near the sidewalk by the Arby's. He observed the victim cross the double yellow line on the four-lane State Road. The victim stopped, stood there, and was yelling. J.C. saw Straughan extend his arm out but could not see what was in his hand. The victim flinched or ducked. J.C. thought maybe it was a taser because he did not hear a gunshot. J.C. pulled around the parking lot and encountered the Burger King employee who told J.C. that "[t]hat guy just shot at the other guy."

{¶19} At the time of the altercation, Mrs. Smith was with her husband and daughter in the Arby's parking lot. The windows were rolled down and she heard "a really heated argument" between two men. The men were in each other's faces and were yelling at the same time. She thinks she heard, "Back off; get away from me." Mrs. Smith did not observe any physical confrontation. She saw the victim walking across State Road and Straughan then pulled out a weapon, pointed it at the victim's back, and then fired a shot. The victim then turned around and said something but proceeded to go back across the road. Once the gun was pulled, Mrs. Smith's

husband called 911. In the 911 call, her husband described Straughan as having a limp. Mrs. Smith averred that the bullet would have had to cross State Road or another road near the intersection so long as it did not encounter another obstruction along the way.

{¶20} R.K. was also near the Burger King at the time of the shooting. He was in his car and heard some arguments and then a gunshot. R.K. observed the victim running across the street and Straughan standing in the Burger King parking lot. R.K. indicated that Straughan had pointed the gun at the victim who was running away. At the time of the shooting, the victim was facing away from Straughan and, according to R.K. was already on the far side of the street. R.K. believed the bullet would have traveled over State Road. He did not observe any physical contact between the two men.

## Sufficiency

{¶21} When reviewing the sufficiency of the evidence, this Court must review the evidence in a light most favorable to the prosecution to determine whether the evidence before the trial court was sufficient to sustain a conviction. *State v. Jenks*, 61 Ohio St.3d 259, 279 (1991).

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*Id*. at paragraph two of the syllabus.

{¶22} With respect to the elements of the offenses, Straughan only challenges whether the State met its burden with respect to the elements of R.C. 2923.162(A)(3).

{¶23} R.C. 2923.162 provides in relevant part:

(A) No person shall * * *:

(3) Discharge a firearm upon or over a public road or highway.

\* \* \*

(C) Whoever violates this section is guilty of discharge of a firearm on or near prohibited premises. A violation of division (A)(1) or (2) of this section is a misdemeanor of the fourth degree. A violation of division (A)(3) of this section shall be punished as follows:

(1) Except as otherwise provided in division (C)(2), (3), or (4) of this section, a violation of division (A)(3) of this section is a misdemeanor of the first degree.

(2) Except as otherwise provided in division (C)(3) or (4) of this section, if the violation created a substantial risk of physical harm to any person or caused serious physical harm to property, a violation of division (A)(3) of this section is a felony of the third degree.

{¶24} Specifically, Straughan asserts that there was insufficient evidence concerning the bullet's ultimate resting place to support a conviction under R.C. 2923.162(A)(3). As discussed above, the bullet was not recovered by police nor did Straughan turn the bullet in that he claimed he found. "However, lack of physical evidence does not mean that the evidence the state did present was insufficient to convict a defendant of the offenses with which he or she was charged." *State v. Bradley*, 8th Dist. Cuyahoga No. 10893, 2020-Ohio-3460, ¶ 34.

{¶25} Here, some of the State's eyewitnesses testified that the bullet would have crossed over State Road or another road given the direction the gun was pointed when it was fired. In addition, there was testimony that the victim was in the road at the time the shot was fired and that he had gunshot residue on his back. There were also four holes discovered in the back of the victim's shirt that an officer believed were caused by a bullet. The victim himself averred that the holes were not there prior to the shooting. Viewing the evidence in a light most favorable to the prosecution, we conclude that the State presented sufficient evidence, if believed to support a finding of guilt on the charge of violating R.C. 2923.162(A)(3) and 2923.162(C)(2).

**{¶26}** Straughan also argues that the State failed to present sufficient evidence to demonstrate that he did not act in self-defense. We note that at the time of the shooting, August 14, 2018, the new version of the self-defense statute had not yet taken effect. However, at the time of trial, the statute had taken effect. "Until recently, self-defense was an affirmative defense that was required to be proven by a defendant by a preponderance of the evidence." *State v. Williams,* 9th Dist. Summit No. 29444, 2020-Ohio-3269, ¶ 10. "Recent amendments to R.C. 2901.05(B), however, reallocated the burden of proof with respect to self-defense[.]" *Id.* "Consequently, once there is evidence presented at trial that tends to support that the defendant acted in self-defense, the State must disprove one of the elements of self-defense beyond a reasonable doubt." *Id.*

**{¶27}** Previously, this Court has concluded that, when the offense at issue occurred prior to March 28, 2019, former R.C. 2901.05(A) applies, and it is the defendant's burden to prove, by a preponderance of the evidence, that he acted either in self-defense or in defense of others. *State v. Brown*, 9th Dist. Wayne No. 19AP0004, 2020-Ohio-529, ¶ 23. However, in circumstances similar to this, where the parties agreed at trial to utilize the new version of the statute even though the crime took place prior to the effective date, this Court has applied the new statute in resolving the appeal. *See Williams* at ¶ 4, 29, 32. In this case, the parties seemed to agree that the new statute applied, and the trial court instructed the jury based upon that amended version. Given this Court's precedent in *Williams*, we will also review this appeal pursuant to the amended statute.

**{¶28}** Pursuant to R.C. 2901.05(B)(1):

> A person is allowed to act in self-defense, defense of another, or defense of that person's residence. If, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense, defense of another, or defense of that person's residence, the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense, defense of another, or defense of that person's residence, as the case may be.

{¶29} "Self-defense requires that a defendant was not at fault in creating the situation giving rise to the affray; * * * [had] a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and * * * [did] not * * * violate[ ] any duty to retreat or avoid the danger."   (Internal quotations omitted.)  *Williams,* 2020-Ohio-3269, at ¶ 9, quoting *State v. Robbins*, 58 Ohio St.2d 74 (1979), paragraph two of the syllabus.  "An individual who is the first aggressor in an incident is 'at fault' for purposes of self-defense."  *Williams* at ¶ 9.  "In Ohio, there is an objective and a subjective aspect involved in determining whether a defendant had a bona fide belief that he or she was in imminent danger of death or great bodily harm:  an individual's belief that he or she was in imminent danger must be objectively reasonable, and the individual must have an honest subjective belief to that effect."  *Id.* at ¶ 11.

{¶30}  Reviewing the record in a light most favorable to the prosecution, we conclude the State presented sufficient evidence, if believed, to disprove at least one of the elements of self-defense.  *See State v. Warren*, 9th Dist. Summit No. 29455, 2020-Ohio-6990, ¶ 14.  There was evidence presented that the victim was moving away from Straughan when Straughan shot at the victim.  This would support that Straughan did not have a bona fide belief that he was in immediate danger of death or great bodily harm at the time he utilized deadly force.  *See Williams* at ¶ 9.  There was also evidence from which it could be concluded that Straughan could have retreated.  *See id.*  Given the foregoing, we conclude that the State presented sufficient evidence to disprove Straughan's self-defense claim.

{¶31}  Straughan's challenge to the sufficiency of the evidence is overruled.

**Manifest Weight**

{¶32} Straughan additionally argues that his convictions are against the manifest weight of the evidence. In so doing, he points to the differences in the testimony among the eyewitnesses. He does not specifically challenge the jury's rejection of self-defense in his manifest weight argument; nonetheless, we will briefly address it as it was the center of his defense. Straughan also mentions that there was no tangible proof that the bullet traveled across a roadway.

> In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986).

{¶33} "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the fact[-]finder's resolution of the conflicting testimony." *State v. Thompkins*, 78 Ohio St.3d 380, 387, quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). An appellate court should exercise the power to reverse a judgment as against the manifest weight of the evidence only in exceptional cases. *Otten* at 340.

{¶34} It is true that the eyewitness testimony differed with respect to how the events unfolded. However, "[t]his Court has consistently held that the trier of fact is in the best position to evaluate the credibility of witnesses and resolve factual disputes." (Internal quotations and citations omitted.) *State v. Moore*, 9th Dist. Summit No. 29418, 2020-Ohio-3708, ¶ 30. "[T]he jury is free to believe all, part, or none of the testimony of each witness." (Internal quotations and citations omitted.). *State v. Gannon*, 9th Dist. Medina No. 19CA0053-M, 2020-Ohio-3075, ¶ 20.

"This Court will not overturn a conviction on a manifest weight challenge only because the jury found the testimony of certain witnesses to be credible." *Id.*

{¶35} Here, after an independent review of the evidence, we conclude that the jury was not unreasonable in rejecting the affirmative defense of self-defense. Given all the conflicts in the testimony, the jury could have reasonably believed that the victim was moving away from Straughan when Straughan shot at the victim. In that case, the jury would not have been unreasonable in concluding that the State demonstrated that Straughan did not have a bona fide belief that he was in immediate danger of death or great bodily harm at the time he utilized deadly force. *See Williams*, 2020-Ohio-3269, at ¶ 9. The jury also could have reasonably concluded, given the variations in the testimony, that the State demonstrated that Straughan could have retreated or that his belief that his use of deadly force was necessary was not objectively reasonable under the circumstances. *See id.* at ¶ 10-11. The State only had to prove beyond a reasonable doubt that one of the elements of self-defense was not satisfied. *See id.* at ¶ 10. Given the argument before us, we cannot say that Straughan demonstrated that the jury lost its way in rejecting his claim of self-defense.

{¶36} With respect to Straughan's argument that there was no tangible evidence to support where the bullet went, we already addressed that issue in terms of sufficiency and concluded that it was without merit.

{¶37} Straughan has not demonstrated that his convictions are against the manifest weight of the evidence. Straughan's first assignment of error is overruled.

### ASSIGNMENT OF ERROR II

THE TRIAL COURT COMMITTED PLAIN AND REVERSIBLE ERROR WHEN IT UTILIZED A VAGUE AND INCOMPLETE JURY INSTRUCTION, FAILED TO HOLD A HEARING ON THE ISSUE OF DEFENDANT'S

HEARING IMPAIRMENT AND FAILED TO HOLD A HEARING ON AN ATTORNEY HAVING OUTSIDE CONTACT WITH A JUROR.

{¶38} Straughan argues in his second assignment of error that the trial court committed plain error in the self-defense instruction it gave the jury, in failing to hold a hearing on Straughan's hearing impairment, and in failing to hold a hearing concerning an incident involving a juror talking to a prosecutor.

{¶39} Under Crim.R. 52, "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." "To establish plain error, one must show (1) an error occurred, i.e., a deviation from a legal rule, (2) the error is plain, i.e., an obvious defect in the proceedings, and (3) the error affected a substantial right, i.e., affected the outcome of the proceedings." *State v. Berila*, 9th Dist. Medina No. 19CA0007-M, 2020-Ohio-3523, ¶ 43, quoting *State v. Grant*, 9th Dist. Summit No. 29259, 2019-Ohio-3561, ¶ 5. "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus.

## Jury Instruction

{¶40} Straughan argues that the trial court's self-defense instruction was vague and insufficient. He asserts that the entirety of the instruction was that "the state must prove beyond a reasonable doubt that the defendant did not use deadly force in self-defense," that if "the state proved beyond a reasonable doubt that self-defense does not apply, you must find the defendant guilty according to your findings[,]" and that "if you find the state failed to prove beyond a reasonable doubt that self-defense does not apply, you must find defendant not guilty according to your findings." Thus, he claims that the instruction failed to spell out what must be proven beyond a reasonable doubt. However, Straughan's recitation of the instruction is incomplete.

**{¶41}** With respect to self-defense, the trial court instructed the jury as follows:

The Defendant, Jeffrey Allen Straughan, is allowed to use deadly force in self-defense. If you find that evidence was presented that tends to support the finding that the Defendant used deadly force in self-defense, the State must prove, beyond a reasonable doubt, that the Defendant did not use deadly force in self-defense.

"Self-defense" means that:

(1) The Defendant was not at fault in creating the situation giving rise to the actions that caused physical harm to [the victim]; and

(2) The Defendant had reasonable grounds to believe and an honest belief even if mistaken, that he was in imminent danger of death or great bodily harm; and

(3) The Defendant did not violate any duty to retreat to avoid the danger; and

(4) The Defendant used reasonable force.

"Deadly force" means any force that carried with it substantial risk that it will proximat[ely] result in the death of a person.

"Serious physical harm" and "great bodily harm" mean the same thing, and you are instructed to rely upon your common understanding of the English language for the definition of "great bodily harm."

"Substantial risk" means a strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur or that certain circumstances exist.

* * *

Duty to retreat:

The Defendant, Jeffrey Allen Straughan, had a duty to retreat if:

(1) He was at fault in creating the situation giving rise to the actions that caused physical harm to [the victim]; or

(2) He did not have reasonable grounds to believe and an honest belief that he was in imminent danger of death or great bodily harm; or

(3) He had a reasonable means of escape from that danger other than by the use of deadly force.

The Defendant, Jeffrey Allen Straughan, did not have a duty to retreat if:

(1) He retreated from the situation; and

(2) He then had reasonable grounds to believe and an honest belief that he was in imminent danger of death or great bodily harm; and

(3) The only reasonable means of escape from that danger was by the use of deadly force, even though he was mistaken as to the existence of that danger.

Test for reasonableness:

Words alone do no justify the use of deadly force or force. Resort to such force is not justified by abusive language, verbal threats, or other words, no matter how provocative.

In deciding whether the Defendant, Jeffrey Allen Straughan, had reasonable grounds to believe and an honest belief that he was in imminent danger of death or great bodily harm, you must put yourself in the position of the Defendant, with his characteristics, his knowledge or lack of knowledge, and under the circumstances and conditions that surrounded him at the time. You must consider the conduct of [the victim] and decide whether his acts and words caused the Defendant to reasonably and honestly believe that he was in danger of death or great bodily harm.

If the Defendant used more force than reasonably necessary and if the force used is greatly disproportionate to the apparent danger, then the defense of self-defense is not available.

Conclusion:

If you find that the State proved beyond a reasonable doubt all the elements of Felonious Assault, Aggravated Menacing, [a]nd/[o]r Discharge of a Firearm on or Near Prohibited Premises, and that the State proved beyond a reasonable doubt that self-defense does not apply, you must find the Defendant guilty according to your findings.

If you find that the State failed to prove beyond a reasonable doubt any of the elements of Felonious Assault, Aggravated Menacing and/or Discharge of a Firearm on or Near Prohibited Premises, or if you find that the State failed to prove beyond a reasonable doubt that self-defense does not apply, you must find the Defendant not guilty according to your findings.

**{¶42}** While the instruction may not be textbook perfect, in light of Straughan's argument on appeal, which asserts the instruction was vague and insufficient, we conclude that Straughan has not demonstrated that the trial court committed error, plain or otherwise, in instructing the jury on self-defense. Despite Straughan's claim to the contrary, the instruction was quite lengthy and detailed. Thus, Straughan's argument is overruled.

**Straughan's Hearing Impairment**

**{¶43}** Straughan additionally argues that the trial court committed plain error in failing to sua sponte conduct an evidentiary hearing on the issue of his hearing impairment.

**{¶44}** In support of Straughan's claim, he relies upon *State v. Schaim*, 65 Ohio St.3d 51 (1992). In *Schaim*, "[a]fter the conclusion of the trial, the defendant moved for a new trial because he had been unable to hear significant portions of the testimony at trial. The defendant proffered the testimony of several experts regarding the extent of his disability." *Id.* at 64. On appeal, "[t]he defendant assert[ed] that the trial court erred in refusing to allow a post-trial evidentiary hearing as to the extent that the defendant was capable of understanding the testimony at trial." *Id.* The Supreme Court agreed "that the trial court should have granted an evidentiary hearing, given the proffer of expert testimony that the defendant was unable to understand most of the proceedings against him." *Id.* In so doing, the Supreme Court concluded that, "[t]he Sixth Amendment requires a trial court to grant an evidentiary hearing when a defendant makes a credible claim that he or she is seriously hearing-impaired." *Id.* However, nothing in *Schaim* suggests that a trial court has an absolute obligation to sua sponte order an evidentiary hearing when a defendant presents with any level of hearing impairment. In fact, in *State v. Taylor*, 98 Ohio St.3d 27, 2002-Ohio-7017, the Supreme Court concluded that the trial court appropriately addressed the defendant's hearing impairment without holding a hearing. *See id.* at ¶ 60. The Supreme Court noted that the "Appellant did not request an evidentiary hearing or proffer expert testimony on his hearing impairment, as was the case in *Schaim*, and thus waived his right to complain about this issue now." *Id.*

**{¶45}** In the instant matter, Straughan's hearing impairment was raised early in the proceedings. Prior to jury selection, defense counsel informed the trial court that Straughan had

"a little bit of a hearing problem, and he can't hear what [the prosecutor] is saying." The trial court then mentioned turning the microphones up and also stated that the trial court had headphones. The trial court then asked Straughan if that was better. Straughan responded in the affirmative. It is unclear from the record what changes the trial court actually made. Shortly thereafter, Straughan again brought up difficulty hearing, but indicated that it would help if the prosecutor would face him. Straughan does not point to any additional hearing difficulties until near the end of the trial, during his cross-examination. During this time, the prosecution played Straughan's 911 call for him. The prosecutor's questions pertained to things that the victim was allegedly saying during the call. The record is clear that Straughan had difficulty hearing what was being said on the call. However, in listening to the recording, it is generally difficult to make out what anyone but Straughan, the caller, is saying. Thus, it is difficult to conclude that Straughan's inability to hear at that point was due to his impairment as opposed to the quality of the recording. To the extent Straughan additionally asserted that he had difficulty hearing himself on the recording, the recording was again played for him.

{¶46} Overall, we cannot say that Straughan has demonstrated that the trial court committed plain error in failing to sua sponte conduct an evidentiary hearing concerning his hearing impairment. In so doing, we reiterate that Straughan's level of hearing impairment was not documented in the record nor were the accommodations made by the trial court. In addition, we are mindful that Straughan has not cited to R.C. 2311.14 (concerning the use of interpreters in court) or Sup.R. 88 or 89 (addressing the appointment of interpreters and the use of communication services in ancillary services) in his argument. Straughan has not argued that an American Sign Language interpreter would have aided his understanding of the proceedings and nothing in the record suggests that he understood American Sign Language at the time of the proceedings.

{¶47} While we cannot say that the trial court committed plain error in failing to hold an evidentiary hearing on the issue of Straughan's hearing impairment given the arguments and record before us, we do note that in situations where a defendant's ability to understand or hear the court proceedings are in question, it is always the better practice for the trial court to err on the side of caution and hold a hearing or at least inquire as to the extent of the defendant's inability to hear and as to what services would be necessary, if any, to alleviate this inability. "The Confrontation Clause requires that a defendant be given the opportunity to be physically present at trial, that the defendant be competent to assist in his own defense, and that the defendant understand the language of the forum. A defendant who cannot hear is analogous to a defendant who cannot understand English, and a severely hearing-impaired defendant cannot be tried without adopting reasonable measures to accommodate his or her disability." (Internal citation omitted.) *Schaim*, 65 Ohio St.3d at 64. Here, however, there was no evidence in the trial court that meets that criteria.

### Juror's Contact with a Prosecutor

{¶48} Straughan argues that the trial court committed plain error in failing to hold a hearing pursuant to *Remmer v. United States*, 347 U.S. 227 (1954), after a juror made a comment to a prosecutor during a break.

{¶49} Towards the end of the trial, following a break, the following discussion occurred between the trial court and the attorneys:

> [Prosecutor]: At the break, I was on my way down the elevator and one of the jurors approached me and made a statement to the fact of: Are you – something – are you going to do direct or you should have done direct.
>
> And then I didn't respond. I put my head down, and I got on the elevator.
>
> I informed counsel of that statement once I got back, but there was no conversation between her and myself. And she didn't indicate anything else other than that kind of statement.

[Trial Court]: Okay. Is there – so, [defense counsel], you have been made aware of this?

[Defense Counsel]: I have. And it sounds to me as though it is inadvertent communication, and I'm not going to object to it. I'm not going object to his response to it. I'm not going to ask [] that the juror be released or anything like that.

[Trial Court]: Is the State making a request to have the juror removed?

[Prosecutor]: No, Your Honor. I just wanted the Court to be aware, and I wanted the record to reflect.

[Trial Court]: Okay. All objections have been waived to Juror Number –

[Prosecutor]: I don't even know what juror number. I put my head down as soon as –

[Trial court]: Do you know if it was Juror Number #12, #13, or #14?

[Prosecutor]: It was not an alternate. It was one of the female jurors on the main panel, but I can't tell you what number she was.

[Trial Court]: Okay. But no objection – there is no objection from either side as to her remaining on the jury, correct?

[Prosecutor]: Correct.

[Trial Court]: [Defense counsel]?

[Defense Counsel]: That is correct, Your Honor. Thank you.

{¶50} Here, we conclude that the ability to challenge this issue was waived by defense counsel. "Waiver is the intentional relinquishment or abandonment of a known right. Unlike forfeiture - which is the failure to preserve an objection - waiver extinguishes even claims of plain error under Crim.R. 52(B)." (Internal quotations and citations omitted.) *State v. Gibbs*, 9th Dist. Lorain No. 17CA011116, 2019-Ohio-4215, ¶ 11. Straughan's counsel did not merely fail to object, he repeatedly affirmatively stated that he had no objection.

{¶51} However, even assuming that Straughan could argue plain error, he would not succeed. "Ohio law prohibits outside influences, if they are shown to be prejudicial." *State v.*

*Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539, ¶ 270. "Any communication or contact outside the courtroom or jury room about the matter at trial between a juror and another person, particularly if connected with one of the parties to the litigation, and any independent inquiry or experiment by a juror about the evidence or the law, violate the juror's duty to limit his considerations to the evidence, arguments and law presented in open court. Any such activity is juror misconduct, a constitutional violation whether viewed under the Fourteenth Amendment to the United States Constitution or Section 10, Article I of the Ohio Constitution." *Id.*, quoting *State v. King*, 10 Ohio App.3d 161, 163 (1st Dist.1983).

{¶52} In *Ford*, the Ohio Supreme Court rejected the defendant's assertion that he was entitled to a *Remmer* hearing. The Supreme Court stated that, "[i]n *Remmer*[], the United States Supreme Court held that a trial court confronted with an allegation of external tampering or contact with a juror during trial about a matter pending before the jury should determine the circumstances, the impact [of the circumstances] upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate." (Internal quotations omitted.) *Ford* at ¶ 274. The Supreme Court of Ohio then held that "not all communications with jurors warrant a hearing for a determination of potential bias. An allegation of an unauthorized communication with a juror requires a *Remmer* hearing only when the alleged contact presents a likelihood of affecting the verdict." (Internal quotations and citations omitted.) *Ford* at ¶ 275.

{¶53} We cannot say that Straughan has demonstrated that the juror's limited contact with the prosecutor presented a likelihood of affecting the verdict, particularly given what was said. *See id.*

{¶54} Straughan's second assignment of error is overruled.

## ASSIGNMENT OF ERROR III

THE STATE OF OHIO ENGAGED IN MULTIPLE INSTANCES OF PROSECUTORIAL MISCONDUCT, THAT INFRINGED UPON DEFENDANT'S CONSTITUTIONAL RIGHTS AND DEPRIVED DEFENDANT OF A FAIR TRIAL.

{¶55} Straughan argues in his third assignment of error that the State engaged in multiple instances of prosecutorial misconduct that deprived him of a fair trial. Specifically, Straughan points to instances of what he characterizes as the prosecutor making comments contrary to Ohio law concerning an individual's right to carry a firearm, the prosecutor displaying a screenshot of a Facebook page that was ultimately deemed inadmissible, and the prosecutor wearing a plastic toy gun on his hip and pointing it at Straughan.

{¶56} "In deciding whether a prosecutor's conduct rises to the level of prosecutorial misconduct, a court determines if the prosecutor's actions were improper, and, if so, whether the defendant's substantial rights were actually prejudiced." *State v. Berila,* 9th Dist. Medina No. 19CA0007-M, 2020-Ohio-3523, ¶ 41, quoting *State v. Moreland*, 9th Dist. Summit No. 27910, 2016-Ohio-7588, ¶ 22. "[A] judgment may only be reversed for prosecutorial misconduct when the improper conduct deprives the defendant of a fair trial. The defendant must show that, but for the prosecutor's misconduct, the trier of fact would not have convicted him. The touchstone of the analysis is the fairness of the trial, not the culpability of the prosecutor." (Internal quotations and citations omitted.) *Berila* at ¶ 41.

{¶57} We note that with respect to most of the comments that Straughan points to, as well as the act of the prosecutor wearing a toy gun and pointing it at Straughan, Straughan's counsel did not object to these occurrences. Because Straughan did not object to these instances in the trial court, he is limited to arguing plain error on appeal. *See Berila* at ¶ 43. However, as Straughan

has not developed a plain error argument, we decline to further consider these comments and actions. *State v. Tyler*, 9th Dist. Summit No. 29225, 2019-Ohio-4661, ¶ 64.

**{¶58}** Straughan's counsel did object when the prosecutor characterized Straughan's act of carrying a weapon on his hip as brandishing it. In so doing, Straughan's counsel noted that that was a legal conclusion. To the extent that the prosecutor misstated the law, the jury was presented with the definition of brandish in the jury instructions. Thus, we fail to see how any misconduct by the prosecutor affected Straughan's substantial rights given the circumstances before us. *Berila* at ¶ 41.

**{¶59}** With respect to the Facebook post, the record reveals that the prosecutor sought to introduce into evidence a Facebook post Straughan allegedly made about a time when someone stole from him. Defense counsel objected to it arguing that it was not relevant and was not provided to him in discovery. While the discussion regarding the post was ongoing, the post was apparently being displayed on some device. Straughan expressed concern that the jury could see it but the prosecutor indicated that the jury could not see it because it was too small. After discussion with the attorneys, the trial court sustained the objection. Straughan argues that the post was visible to the jury during the side bar before the objection was sustained. However, Straughan's argument is speculative. It is not clear from the record that the jury could see the post and ultimately it was not admitted into evidence. Thus, Straughan cannot demonstrate that he was prejudiced by any misconduct that may have occurred.

**{¶60}** Straughan's third assignment of error is overruled.

### ASSIGNMENT OF ERROR IV

MR. STRAUGHAN WAS DENIED HIS CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHEN TRIAL COUNSEL FAILED TO OBJECT TO A VAGUE AND INSUFFICIENT JURY INSTRUCTION, FAILED TO OBJECT TO THE PROSECUTION'S OUTSIDE CONTACT WITH

A JUROR, AND FAILED TO OBJECT TO THE LACK OF A HEARING REGARDING MR. STRAUGHAN'S HEARING IMPAIRMENT.

{¶61} Straughan argues in his fourth assignment of error that he was denied the effective assistance of counsel. Specifically, he argues that his counsel was ineffective in failing to object to the self-defense jury instruction, in failing to object to the juror's contact with the prosecutor, and in failing to object to the lack of a hearing on the issue of Straughan's hearing impairment.

{¶62} In order to prevail on a claim of ineffective assistance of counsel, Straughan must show that "counsel's performance fell below an objective standard of reasonableness and that prejudice arose from counsel's performance." *State v. Reynolds*, 80 Ohio St.3d 670, 674 (1998), citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland* at 686. Thus, a two-prong test is necessary to examine such claims. First, Straughan must show that counsel's performance was objectively deficient by producing evidence that counsel acted unreasonably. *State v. Keith*, 79 Ohio St.3d 514, 534 (1997), citing *Strickland* at 687. Second, Straughan must demonstrate that but for counsel's errors, there is a reasonable probability that the results of the trial would have been different. *Keith* at 534. This Court need not address both prongs of the *Strickland* test if the appellant fails to satisfy either prong. *State v. Ray*, 9th Dist. Summit No. 22459, 2005-Ohio-4941, ¶ 10.

{¶63} With respect to the self-defense instruction, based upon the reasoning above, we cannot say that Straughan's counsel was deficient in failing to object to the jury instruction; we determined that the instruction did not amount to reversible or plain error.

{¶64} As to trial counsel's failure to request a hearing with respect to the juror's contact with the prosecutor, we cannot say that Straughan has demonstrated that his attorney was deficient.

We note that "[a]n allegation of an unauthorized communication with a juror requires a *Remmer* hearing only when the alleged contact presents a likelihood of affecting the verdict." (Internal quotations and citations omitted.) *Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539, at ¶ 275. We determined above that Straughan did not demonstrate on appeal that the contact presented a likelihood of affecting the verdict. Thus, we cannot say that, based upon the record before us, Straughan would have been entitled to a hearing even if counsel had requested one.

{¶65} Straughan additionally argues that his trial counsel was ineffective in failing to request a hearing on Straughan's hearing impairment. From the record, the degree of Straughan's impairment is not clearly evident. It is clear that the trial court offered accommodations to address Straughan's impairment. Throughout the vast majority of the trial, neither Straughan nor his counsel expressed that Straughan had any problems in comprehending the proceedings. While Straughan did on occasion have difficulty hearing certain things, we cannot say that the record demonstrates that he was "seriously hearing-impaired" such that a hearing was required. *See Schaim*, 65 Ohio St.3d at 64. Absent demonstrating that a hearing was required, Straughan's counsel could not be ineffective in failing to request one. Straughan has not met his burden of demonstrating that his trial counsel was ineffective.

{¶66} Straughan's fourth assignment of error is overruled.

### ASSIGNMENT OF ERROR V

DEFENDANT WAS DENIED HIS RIGHT TO A FAIR TRIAL BY THE CUMULATIVE EFFECT OF ALL ERROR ARGUE[D] HEREIN.

{¶67} Straughan argues in his fifth assignment of error that he was denied his right to a fair trial due to cumulative error.

{¶68} "In *State v. DeMarco*, 31 Ohio St.3d 191 (1987), paragraph two of the syllabus, the Ohio Supreme Court recognized the doctrine of cumulative error. It held that although individual

errors during trial may not rise to the level of reversible error, the combined prejudice resulting from those errors may rise to the level of reversible error." *In re F.B.*, 9th Dist. Summit Nos. 28960, 28985, 2019-Ohio-1738, ¶ 47. "Because [Straughan] failed to demonstrate any prejudice resulting from the errors he has alleged, he cannot demonstrate cumulative error." *Id.*

**{¶69}** Straughan's fifth assignment of error is overruled.

III.

**{¶70}** Straughan's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

————

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

DONNA J. CARR
FOR THE COURT

HENSAL, J.
TEODOSIO, J.
CONCUR.


APPEARANCES:

MICHAEL B. WASHINGTON, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN R. DIMARTINO, Assistant Prosecuting Attorney, for Appellee.